[No. B144337. Second Dist., Div. Three. July 26, 2002.]

DALE STOOPS, Cross-complainant and Appellant, v.
ALEX ABBASSI et al., Cross-defendants and Respondents.

**COUNSEL**

Bray, Geiger, Rudquist & Nuss and Peter A. Viri for Cross-complainant and Appellant.

Aguilar & Sebastinelli, Raul V. Aguilar, Allen J. Kent and Robert A. Crook for Cross-defendants and Respondents.

**OPINION**

**ALDRICH, J.—**

### INTRODUCTION

Insurance Code section 1280.7 permits physicians and surgeons to become members of an interindemnity arrangement that creates a trust fund funded by member contributions. The income from the trust fund and assessments of the members is used to cover malpractice lawsuits.

Physicians Interindemnity Cooperative Corporation (PICC) and physicians interindemnity trust (PIT) (collectively (PIT/PICC) were formed pursuant to Insurance Code section 1280.7. A trust fund was established and funded. Subsequently, the trust fund became underfunded and many members refused to pay assessments.

Appellant Dale Stoops (Stoops) was a member/physician of PIT/PICC. Because of the trust fund's financial situation, Stoops did not receive a defense or indemnification with regard to a medical malpractice lawsuit. Stoops contended that had the other members paid the money they owed for assessments, he would have been able to receive coverage for the malpractice lawsuit. Stoops contended that he had the right to sue directly those members who failed to pay assessments. He sought to recover the funds he expended with regard to the medical malpractice lawsuit.

We agree with the trial court that Stoops may not sue the other members directly and we affirm a judgment entered in favor of the other members.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### 1. *PIT/PICC, the trust fund, and the receivership.*

PICC, an interindemnity cooperative corporation, was formed to provide members protection from medical malpractice claims. Each PICC member signed an agreement entitled "physicians interindemnity trust agreement" (hereinafter PIT agreement and cited as PIT Ag.), forming PIT. Both entities were formed and followed the dictates of Insurance Code section 1280.7. The members paid initial contributions and thereafter paid assessments, which were deposited into a trust fund that was used to cover defense and indemnity for medical malpractice lawsuits.

In September 1995, the PIT board of trustees approved a plan of winding up and termination of PIT due to a determination that an assessment of $32.5 million was necessary to replenish the trust fund and to raise sufficient funds for defense and indemnity. The plan included a proposal that the members would obtain malpractice insurance through a specified insurance company. The plan was approved and PIT ceased providing coverage to members for future acts.

In March 1996, in an action brought in the Los Angeles Superior Court by the Department of Corporations, PIT/PICC was ordered into receivership.

David A. Gill (Gill) was appointed receiver of PIT/PICC. The order appointing receiver gave Gill the authority to enforce and collect all debts of the trust and PICC, including assessments.[2] Thereafter, Gill deemed that the trust fund had insufficient funds to pay debts to defend against, and indemnify for, malpractice claims. Gill sent a letter to all members demanding

---

[1]The matter comes to us upon a judgment entered after the trial court sustained demurrers and granted a motion for judgment on the pleadings. Thus, for purposes of appeal, we accept as true the facts stated in the pertinent pleadings. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300-301 [58 Cal.Rptr.2d .855, 926 P.2d 1042]; *McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138, 1144 [87 Cal.Rptr.2d 95].)

[2]Provision 3.4 of the order appointing Gill read: "Receiver is authorized and empowered to enforce and collect any debts, claims, accounts receivable, rents or other obligations due the Trust and PICC and to institute and prosecute in his own name as such Receiver, suits for the enforcement and recovery of the same. Subject to the provisions in Paragraph 5 of this Order ('Notice') the Receiver is authorized and empowered to settle and compromise any such obligations whenever, in his judgment said compromise or settlement is in the best interests of the parties involved in this action."

Provision 3.5 of the order appointing Gill read: "Without limiting the generality of the foregoing Paragraph 3.4, the Receiver shall possess all rights of the Receivership Estate including the Trust relative to claims against any one, including, without limitation, claims

assessment payments. Only 20 percent of the members responded. PIT members stopped receiving coverage for malpractice lawsuits.

In July 1997, Gill filed the underlying action (*Gill v. Abbassi*) against all members of PIT/PICC. Gill sought to recover more than $51 million, including funds owed as unpaid assessments levied by the trust's board of trustees, as well as sums for receiver's assessment.

Approximately 300 members of PIT/PICC were represented by one law firm, the law firm of Aguilar & Sebastinelli. These members appear as respondents herein.

2.  *Stoops and his cross-complaint.*

Stoops was a member of PIT/PICC. In December 1993, Deborah and Peter Bonilla filed a medical malpractice action against Stoops. PIT undertook the defense. In 1995, the Bonillas made a $1 million demand. After learning that the case against him was one of probable liability, Stoops demanded PIT settle the lawsuit for an amount up to and including the $1 million coverage limit provided in the PIT agreement. PIT never made a settlement offer.

Stoops was among the 20 percent of the members who responded to Gill's assessment demand.

Gill informed Stoops that an insufficient number of members had paid the assessments and PIT would no longer provide a defense nor indemnification with regard to the Bonilla case. Stoops incurred $77,465.13 in legal fees defending the Bonilla matter. In 1997, a jury rendered a judgment against Stoops in the amount of $1.58 million, plus approximately $10,000 in costs. To satisfy the judgment, Stoops assigned assets to the Bonillas estimated to be worth $1 million.

Stoops filed a cross-complaint in *Gill v. Abbassi* against Gill (as receiver), PIT, PICC, and against the other PIT/PICC members. In his second amended cross-complaint, Stoops alleged 10 causes of action.

The first and second causes of action (breach of contract and tortious breach of contract) alleged PIT/PICC breached the PIT agreement and Insurance Code section 1280.7 by failing to defend, settle, or provide indemnification with regard to the Bonilla case, and did so in bad faith.

against members or former members of the Trust for all assessments heretofore made by the Trust. Receiver shall be entitled to make and enforce assessment in addition to those previously made to the extent permitted by applicable contracts and statutes."

The third through 10th causes of action are the subject of this appeal. They are alleged against 767 PIT/PICC members, including respondents. Three of the causes of action are for declaratory relief. The other causes of action are labeled breach of contract, breach of fiduciary duty, equitable estoppel, dissolution and accounting, and contribution. In essence, Stoops alleges the other PIT/PICC members, including respondents, have violated their obligations to pay assessments, thereby forcing Gill to terminate the defense and indemnification of the Bonilla matter. Stoops has sought to recover the funds he has expended relating to the Bonilla case, including expenditures for attorney fees and the adverse judgment. Stoops also seeks emotional distress damages. Further, he seeks declarations of rights as to whether members have personal liability for assessments, whether members were subject to supplemental assessments, and whether he can pursue those members who have failed to pay assessments. Stoops also alleges he is entitled to an accounting of PIT's assets and liabilities.

### 3. *The two demurrers and motion for judgment on the pleadings.*

Respondents first demurred to the ninth and 10th causes of action. This was followed by a demurrer to the third through eighth causes of action brought by two individual doctors, as well as a motion for judgment on the pleadings as to the third through eighth causes of action brought by respondents. (See fn. 3.) The trial court sustained both demurrers without leave to amend and granted the motion for judgment on the pleadings. Additionally, the trial court, on its own motion, concluded that all named cross-defendants, i.e., all other PIT/PICC members, were to be included in the rulings. The result of these rulings was that Stoops was foreclosed from pursuing a direct action against the other PIT/PICC members as he had alleged in the third through tenth causes of action. The premise underlying the rulings was that the authority to collect assessments was vested in the board of trustees and/or Gill, as receiver.

On July 11, 2000, a judgment upon order granting motion on the pleadings and a judgment upon order sustaining demurrer were entered with regard to all named cross-defendants, including respondents and the two individual members. Stoops appealed.[3]

---

[3]Besides representing respondents, Aguilar & Sebastinelli also represented the two individual PIT/PICC members, Drs. Craig Mueller and Pratibha Desai. For ease of reference, we continue to refer to all members represented by Aguilar & Sebastinelli (including Mueller and Desai) as respondents.

While a judgment was entered on the cross-complaint on behalf of all members, only those members represented by Aguilar & Sebastinelli appear on appeal.

Gill is not a party to this appeal.

DISCUSSION

1. *Standard of Review.*

■ " 'Our only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action. Accordingly we assume that the complaint's properly pleaded material allegations are true and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context. [Citations.]' " (*People ex rel. Lungren v. Superior Court, supra*, 14 Cal.4th at p. 300.) "Where written documents are the foundation of an action and are attached to the complaint and incorporated therein by reference, they become a part of the complaint and may be considered on demurrer. [Citations.]" (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 800 [107 Cal.Rptr.2d 710].)

■ "A motion for judgment on the pleadings may be made at any time either prior to the trial or at the trial itself. [Citation.]" (*Ion Equipment Corp. v. Nelson* (1980) 110 Cal.App.3d 868, 877 [168 Cal.Rptr. 361].) Such motion may be made on the same ground as those supporting a general demurrer, i.e., that the pleading at issue fails to state facts sufficient to constitute a legally cognizable claim or defense. (*McCutchen v. City of Montclair, supra,* 73 Cal.App.4th at p. 1144.)

2. *Stoops may not proceed directly against the other PIT/PICC members because his third through 10th causes of action are directed at the collection of assessments.*

■ Stoops's third through 10th causes of action were designed to assert claims against the other PIT/PICC members for their failure to pay assessments. Stoops believes that had these other members fulfilled their contractual obligations to pay assessments, he would have received a defense and indemnification in the Bonilla lawsuit. Stoops argues that he has an individual right to pursue the other members directly to collect unpaid assessments. Based upon these beliefs, Stoops contends the trial court erred in sustaining the demurrers and granting the motion on the pleadings. This contention is not persuasive.

We agree with the trial court that Gill, acting as receiver for the PIT trust fund and its board of trustees, is the only person who can pursue the collection of assessments. Thus, as the trial court has ruled, Stoops cannot pursue his third through 10th causes of action in his cross-complaint. Insurance Code section 1280.7, the PIT agreement to which Stoops is a party, and the order appointing Gill receiver, give the responsibility of

pursuing the collection of unpaid assessments to the board of trustees. Since Gill is acting for the board, only he may pursue members for the failure to pay assessments.

In order to explain our conclusion, we detail the statutory scheme, because it is under this scheme that PIT and PICC were organized. We then detail the pertinent provisions of the documents that formed PIT and PICC.

### a. *The statutory scheme.*

Insurance Code section 1280.7 was created as a result of the perceived medical malpractice insurance crisis. (*Mundy v. Mutual Protection Trust* (1990) 219 Cal.App.3d 127, 130 [267 Cal.Rptr. 917], citing Assem. Bill No. 1898 (1975-1976 Reg. Sess.), enacted as Stat. 1976, ch. 1462, § 5, p. 6560.) It was designed to provide doctors with an alternative to medical malpractice insurance. This statute permitted physicians and surgeons to pool their resources to cover medical malpractice claims. The cooperative ventures formed pursuant to this legislation were prohibited from representing that they were insurance companies. (Ins. Code, § 1280.7, subd. (f)(1), (2), (6).)[4]

Insurance Code section 1280.7 details the requirements for these cooperative corporations that have been formed to establish interindemnity arrangements. The following provisions are relevant to the case before us.

Participating members have to be physicians and surgeons licensed in California who execute a copy of a trust agreement, which governs "the collection and disposition of all funds of the interindemnity arrangement." (Ins. Code, § 1280.7, subd. (a).)

The trust agreement must contain, in addition to others, the following provisions: The initial trust corpus is to be "not less than ten million dollars ($10,000,000), which corpus shall be a trust fund to secure enforcement of the interindemnity arrangement." (Ins. Code, § 1280.7, subd. (a)(1).) The interindemnity arrangement cannot become operative until at least 500

---

[4]Insurance Code section 1280.7, subd. (f)(1) and (2) states in part: "It shall be a false or misleading statement to state or represent that a cooperative corporation or interindemnity arrangement is or constitutes 'insurance' or an 'insurance company' or an 'insurance policy.'"

Insurance Code section 1280.7, subd. (f)(6), states in part: Making statements that "a cooperative corporation or interindemnity arrangement is a member of the California Insurance Guarantee Association, or insured against insolvency as defined in Section 119.5[]" is an act of unfair methods of competition and constitutes a deceptive act or practice.

participating members contribute an average of $20,000. (Ins. Code, § 1280.7, subd. (a)(1).) "The reserve trust fund created by the trust agreement shall be administered by a board of trustees . . . ." (Ins. Code, § 1280.7, subd. (a)(2).) Members of the board of trustees are to be members of the interindemnity arrangement and fiduciaries. (Ins. Code, § 1280.7, subd. (a)(2), (3).) The board is to "be the custodian of all funds of the interindemnity arrangement . . . ." (Ins. Code, § 1280.7, subd. (a)(3).) The board is to invest all funds held in trust that are in excess of current financial needs, within statutory guidelines. (Ins. Code, § 1280.7, subd. (a)(4).) Withdrawal of the corpus of the reserve trust, or any portion thereof, requires written authorization of at least two-thirds of the board members. (Ins. Code, § 1280.7, subd. (a)(7).) The income to be derived from the corpus of the trust is to be used as the source for the payment of medical malpractice claims, costs, judgments, and settlements, and for the payment of the fund's costs of administration. (Ins. Code, § 1280.7, subd. (a)(5).)[5] If the income from the trust and dues by the members are insufficient for these purposes, the board of trustees has the "power and authority to assess participating members for all amounts necessary to meet the obligations of the interindemnity arrangement . . . ." (Ins. Code, § 1280.7, subd. (a)(5).) The board also "may make assessments to increase the corpus of the trust fund . . . ." (Ins. Code, § 1280.7, subd. (a)(5).) "Any assessment levied against a member shall be the personal obligation of the member." (Ins. Code, § 1280.7, subd. (a)(5).) Changes in the assessment agreement between the interindemnity arrangement and its membership are to be ratified by the entire membership by 75 percent of those voting. (Ins. Code, § 1280.7, subd. (a)(5).) Unless there is reinsurance of excess limits coverage, each member is to be "covered by the interindemnity arrangement for not less than one million dollars ($1,000,000) for each occurrence of professional negligence . . . ." (Ins. Code, § 1280.7, subd. (a)(6).) The board is to furnish financial reports to each member and the Commissioner of Corporations. (Ins. Code, § 1280.7, subd. (a)(8).) The board is empowered to terminate a person's membership for the failure to comply with any provision of the trust agreement, and for the failure to pay any assessment when due, thereby terminating indemnity coverage. (Ins. Code, § 1280.7, subd. (a)(9)(D), (E).)[6] Members can voluntarily terminate their membership and elect to cease being responsible for future assessments, or elect to continue to pay assessments until that person's initial contribution has been repaid. (Ins. Code, § 1280.7, subd.

---

[5]If the reserve trust fund has at least $20 million, in addition to medical malpractice claims, the cooperative corporation may enter into contracts to cover other liabilities. (Ins. Code, § 1280.7.)

[6]By following certain procedures, the board also has the right to terminate the membership of a participating member upon the board's determination that it "is in the best interests of the interindemnity arrangement even though that person has complied with all of the provisions of the trust agreement." (Ins. Code, § 1280.7, subd. (a)(9)(G).)

(a)(9)(F).) The interindemnity arrangement and the reserve trust fund incident thereto, can be terminated by "the vote or written consent of not less than three-fourths of the participating members." (Ins. Code, § 1280.7, subd. (a)(13).)

Prospective members are to receive copies of the articles of incorporation and bylaws of the cooperative corporation, and the form of trust agreements to be executed by the prospective participating member. Prospective members are to receive a disclosure statement that contains, among other items, a warning in bold type that participating members have unlimited personal liability for assessments, that there can be no assurances as to the amount or frequency of assessments, and that there can be no assurances that all participating members will make timely payments of their assessments. (Ins. Code, § 1280.7, subd. (c)(2), (3).) The disclosure statement is also to contain other items, including, details about the member's professional practice coverage available under the interindemnity arrangement (Ins. Code, § 1280.7, subd. (c)(3)(A)), as well as a "statement regarding the obligation of each member to pay assessments and the consequences for failure to do so." (Ins. Code, § 1280.7, subd. (c)(3)(F).)

b. *PICC.*

Physicians or surgeons licensed in California became members of PICC, a cooperative corporation. PICC organized PIT. Each physician or surgeon received a disclosure statement. A warning in bold type on the front of the document virtually duplicated the language required by Insurance Code section 1280.7, subdivision (c)(2). Members were warned that they had unlimited liability for assessments and there were no assurances as to the amount or frequency of assessments. They were also warned that there were no assurances that all members would make timely payment of their assessments, that the PIT trust was not an insurance company, and that it could not represent itself as an insurance company.

The disclosure statement summarized the purposes of PIT/PICC by stating that "members pool their financial resources to create a fund out of which payments can be made on behalf of members to indemnify them against certain professional liabilities." The disclosure statement then detailed the workings of PIT/PICC, including that the board of trustees could levy quarterly fees on members to cover the costs of all services, that the members had obligations to make an initial contribution, and thereafter could be obligated for assessments as determined by the board of trustees.

### c. *PIT.*

PICC members each agreed to an interindemnity arrangement contemplated by Insurance Code section 1280.7 by creating, pursuant to the PIT agreement, the physicians interindemnity trust, acting through a board of trustees. Each member executed a copy of the PIT agreement.[7] The acknowledged purpose of the PIT agreement's was that "[t]he Members . . . believe that medical malpractice problems can best be dealt with by an association of physicians and surgeons joining together to protect themselves against malpractice claims." (PIT Ag. recital.) The terms of the PIT agreement were designed to be and were consistent with the provisions of Insurance Code section 1280.7.[8] The trustees of the PIT trust were the same individuals that comprised PICC's board of directors.

The PIT agreement specified the type of coverage provided, the obligations to defend and settle, the limits on liability including, $1 million per claim, and other items relating to coverage. (PIT Ag. §§ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 17, 23, 24.)

The PIT agreement further provided as follows:

Initial contributions were collected and quarterly fees made based upon a member's medical specialty. (PIT Ag. §§ 15, 21.01, 21.03, 22.01.) Such funds were held in a collective reserve corpus, identified as the "Trust Fund." (PIT Ag. preamble, § 15 ["the Trust"].) This trust fund served to secure enforcement of the interindemnity arrangement. The income on the trust fund was to be used to pay "claims, costs, judgments, settlements, and costs of administration." (PIT Ag. § 21.01.) To the extent the trust fund's income was insufficient for such purposes, the board of trustees was empowered to levy individual assessments against PIT members. (PIT Ag. §§ 21.01, 21.02.) The board, exercising its good faith judgment, could apportion the assessments, based upon a variety of factors, including "the risk category and length of exposure of each individual member . . . ." (PIT Ag. § 21.02.) "The amount of any Assessment . . . levied against any Member

---

[7] The PIT agreement was originally effective October 31, 1986. It was amended and restated over the years. The version before us is dated April 20, 1995. The preamble of this agreement states: "This Amended and Restated Agreement is entered into by and among the members of Physicians Interindemnity Cooperative Corporation ('PI'), a cooperative corporation organized and operating under the California Corporations Code, who have agreed to an interindemnity arrangement contemplated by Section 1280.7 of the California Insurance Code by creating, pursuant to this Agreement, Physicians Interindemnity Trust (the 'Trust'), a trust acting by and through a Board of Trustees[.]"

[8] In the event there was a conflict between the PIT agreement and Insurance Code section 1280.7, the terms of Insurance Code section 1280.7 controlled. (PIT Ag. § 30.04.)

shall be a personal obligation of [each] Member. Each such amount, together with interest thereon . . . , may be recovered by suit for money judgment by the Trust . . . ." (PIT Ag. § 21.05.) "[T]he trust may seek judicial action (i) to recover any amounts (including attorneys' fees incurred in connection therewith) which are the subject of fees or Assessments levied against any Member . . . . ; (ii) to terminate the membership of a Member . . . . ; (iii) in connection with the bankruptcy of a Member; and (iv) in connection with the dissolution of the Trust . . . ." (PIT Ag. § 29.) The failure to pay assessments warranted termination of the member's membership. (PIT Ag., § 24.04.) The termination of a member's membership did not "affect the right of the Trust to collect all amounts owing to the Trust by such Member . . . ." (PIT Ag. § 24.04.)

The PIT board of trustees controlled the trust fund corpus. The board had the obligation to make investments as limited by Insurance Code section 1280.7, and to pay expenses and claims. (PIT Ag. §§ 18, 19, 20.) The board had the "power and authority to assess Members for all amounts necessary to meet the obligations of the Trust . . . ." (PIT Ag. § 21.01.)

### d. *Discussion.*

Before we begin the discussion, we note that we are *not* dealing with a situation in which a PIT/PICC member sues PIT/PICC, or their boards, for a failure to defend or pay a claim. Stoops is addressing such issues in his first and second causes of action, which are yet to be litigated. Further, we are *not* faced with a situation in which one member sues the PIT board (or here Gill) for failing to fulfill the responsibility of collecting assessments. The complaint filed by Gill, as receiver, has been brought to recover unpaid assessments. At issue here is whether, given the ongoing litigation brought by Gill, one member may sue other members directly to collect unpaid assessments.

As shown above, PIT and PICC have been formed to provide its physician and surgeon members with an alternative to malpractice insurance. The theory is that as a result of individual member contributions, a sufficient corpus is generated from which members can be provided financial protection from medical malpractice claims. PIT is structured such that if the interest on the corpus is insufficient to accomplish this goal, then the board assesses members to cover the shortfall.

According to Insurance Code section 1280.7 and the PIT agreement, the funds are to be held in the Trust Fund. (Ins. Code, § 1280.7; PIT, Ag. preamble, § 15.) Control of the Trust Fund is given to the board of trustees.

The board is the custodian of all funds of the interindemnity arrangement. (Ins. Code, § 1280.7, subd. (a)(3), (2).) The board is vested with the power and authority to invest all funds (Ins. Code, § 1280.7, subd. (a)(4); PIT Ag. §§ 18, 19, 20), assess and pursue the collection of assessments when required (Ins. Code, § 1280.7, subd. (a)(5); PIT Ag. 21.01, 21.02, 21.05, 29), and pay all claims, costs, judgments, settlements, and costs of administration. (Ins. Code, § 1280.7, subd. (a)(5); PIT Ag. §§ 19, 20, 21.01.) The financial responsibilities of the board include taking judicial action to recover assessments. (PIT Ag. §§ 21.05, 29 ["trust" may seek judicial action].) The board also has the authority to terminate a member's status for the failure to pay assessments. (Ins. Code, § 1280.7, subd. (a)(9)(D); PIT Ag. § 24.04.)

Thus, by contract and statute, only the PIT board was empowered to collect unpaid assessments, including the authority to institute judicial action. When Gill was appointed receiver, the rights and the obligations of the board transferred to him. At that point, Gill had the right and the obligation to handle the financial business of the trust. This included the obligation to collect all outstanding assessments. Additionally, the appointment order specifically granted Gill this authority and responsibility, as it gave Gill the obligation to enforce and to collect assessments. ■■■

Stoops is bound by the contract he signed, by the statutory authority from which PIT was formed, and by the court order. These all vest the board (and hence Gill) with the right and obligation to collect assessments. Thus, Stoops cannot directly pursue other members in an attempt to enforce assessment obligations.[9]

Further, as a practical matter, it would be litigation chaos to permit each of the more than 760 individual members to sue one another in efforts to collect unpaid assessments. Acting for the board, Gill brought *Gill v. Abbassi* against all members to enforce the members' contractual obligations, including the payment of assessments. In resolving the issues framed by Gill's complaint and as mandated in the order appointing him receiver, Gill has the responsibility of marshalling all PIT/PICC assets and paying all debts. In doing so, there will be determinations as to which members are legally obligated for unpaid assessments and the amounts owed. The appointment order (see fn. 2) authorized Gill to settle and compromise claims. This would include the authority to resolve disputes with members as to the amounts

[9]We find unpersuasive Stoops's reliance upon *Cotten v. Perishable Air Conditioners* (1941) 18 Cal.2d 575 [116 P.2d 603, 136 A.L.R. 1068]. It did not involve entities formed pursuant to Insurance Code section 1280.7.

owed for unpaid assessments. In calculating the amount of all interindemnity arrangement debts, there will be resolutions of members' claims. This will include whether Stoops was owed a defense and indemnification of the Bonilla case. After all settlements are completed, all judicial determinations are made, and after all members pay the sums owed, Gill will have marshaled all of the fund's assets. Then, there will be a fund from which PIT's debts can be paid. In this way, all of the financial issues resulting from the demise of PIT/PICC will be addressed. A system that also permits individual members to sue other members for outstanding assessment obligations is unnecessarily cumbersome and interferes with Gill's obligations.

Stoops's third through 10th causes of action are framed in different ways. They seek different remedies. However, regardless of the manner in which they are packaged, these causes of action seek the payment of assessments or a judicial determination that respondents owe funds for unpaid assessments.[10] As discussed, only Gill may bring such causes of action.[11]

Since Gill has the authority and obligation to pursue assessments, the trial court did not err in concluding that Stoops cannot pursue the third through tenth causes of action against respondents.

---

[10]In addition to requesting economic losses, Stoops sought damages for emotional distress for the pain and suffering he incurred as a result of defending the Bonilla matter, in incurring an adverse judgment, and in having to assign assets to the Bonillas. We reject Stoops's contention that because he seeks tort damages, he may sue the other PIT/PICC members. Stoops's causes of action are based upon the simple premise that the other members have failed to comply with their contractual obligations. Stoops may not convert his contract cause of action into a tort. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514-518 [28 Cal.Rptr.2d 475, 869 P.2d 454]; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373]; *Aas v. Superior Court* (2000) 24 Cal.4th 627, 643 [101 Cal.Rptr.2d 718, 12 P.3d 1125]; *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85 [44 Cal.Rptr.2d 420, 900 P.2d 669]; *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43, 46 [86 Cal.Rptr.2d 855, 980 P.2d 407]; compare with *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764 [69 Cal.Rptr.2d 466] [discussing negligence performance of a contract].)

[11]In the ninth cause of action against respondents, Stoops requested an accounting. Insurance Code section 1280.7, subdivision (a)(10) provides that interindemnity members have the right to "access . . . , and [inspect], the books and records of the interindemnity arrangement, which rights shall be similar to the corporate shareholders pursuant to Section 3003 of the Corporations Code, or, commencing January 1, 1977, Sections 1600 to 1605, inclusive, of the Corporations Code." However, the other members do not have the ability to provide the information Stoops requested. Thus, any cause of action seeking an accounting must be asserted against PIT or its board, and thus, against Gill.

To the extent Stoops suggests that the other members must provide him with an accounting of the assessments they have paid, this information will be gathered by Gill in the underlying case.

## DISPOSITION

The judgments are affirmed. Stoops is to bear all costs on appeal.

Klein, P. J., and Croskey, J., concurred.

On August 7, 2002, the opinion was modified to read as printed above.