[No. B170729. Second Dist., Div. Three. May 13, 2004.]

CHARLES CHEN, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.
DAVID A. GILL, as Receiver etc., Real Party In Interest.

**COUNSEL**

Aguilar & Sebastinelli and Allen J. Kent for Petitioner.

No appearance for Respondent.

Danning, Gill, Diamond & Kollitz and George E. Schulman for Real Party in Interest.

**OPINION**

**CROSKEY, J.**—In this case of first impression, we examine the scope, application and limitations of Insurance Code section 1280.7.[1] That statute defined and authorized a specific mechanism for the creation by physicians of

---

[1] Unless otherwise indicated, all statutory references are to the Insurance Code.

cooperative corporations and trusts in order to provide, by means of interindemnity contracts, indemnity and defense coverage for medical malpractice claims. The statute authorized the establishment of a trust to be funded by member contributions and assessments which would be utilized, along with the income derived therefrom, to provide malpractice defense and indemnity coverage.

■ Section 1280.7, however, imposed certain limitations on that coverage. Such limitations, as are relevant here, related to the requirement of a time sensitive good standing membership of any physician seeking coverage for an asserted malpractice claim. The record clearly demonstrates that such requirement was not met in this case. Therefore, the coverage required to support the order of a trial court approving the payment of a claim from trust funds is not present. As a result, we hold that the pending petition for a writ of mandate, directing the trial court to vacate its order approving the payment of a claim on behalf of a physician who was not entitled to coverage, must be granted.

### FACTUAL AND PROCEDURAL BACKGROUND

In response to a perceived medical malpractice crisis, the Legislature,[2] in 1976, enacted emergency legislation permitting the creation of cooperative corporations consisting solely of physicians and surgeons. Section 1280.7 became effective on October 1, 1976, as an emergency measure and authorized the formation of interindemnity arrangements among groups of physicians to provide indemnity and defense coverage for any medical malpractice claims that might be asserted against members of the cooperative corporations created under the statute. We are concerned here with two entities formed pursuant to the statute: Physicians Interindemnity Cooperative Corporation (PIC) and Physicians Interindemnity Trust (PIT). The physician mem-

---

[2] The Legislature expressly stated that the act was "an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution, and shall go into immediate effect. The facts constituting such necessity are: [¶] Due to the continuing medical malpractice insurance crisis, it is necessary that this act take effect immediately so that the interindemnity arrangements may commence functioning at the earliest possible time in order to avert the loss of services provided by health care providers." (Stats. 1976, ch. 1462, § 5, p. 20.)

bers, including the petitioner herein, paid the initial contribution and subsequent assessments that were to be used to fund defense and indemnity coverage.

By the summer of 1995, malpractice claims against several of the members of the PIT had increased in number and severity to the point where the PIT could not continue in operation without levying and collecting a massive assessment against all of the members in order to pay estimated potential liabilities of $35 million.[3] In September of 1995, an assessment of $32.5 million was approved by PIT's board of trustees and all members were so advised. At about the same time, the board prepared and submitted to the members a proposed plan for winding up and terminating the trust as of September 30, 1995. This plan, which also involved an offer by Norcal Mutual Insurance Company to provide *prospective* coverage for all members commencing October 1, 1995, was approved by 95 percent of the members. The PIT, however, would remain liable under the plan for all claims that had been asserted by the cut off date of September 30.

Unfortunately, the PIT was unsuccessful in collecting the new assessment from the physician members. As a result, on March 11, 1996, the California Department of Corporations filed an action against PIT and PIC seeking, among other things, the appointment of a receiver. On March 14, 1996, David A. Gill, the real party in interest herein, was appointed as receiver (hereafter, receiver) and was given authority to enforce and collect all debts of the PIT and PIC, including unpaid member assessments.[4] The receiver also undertook to resolve, settle or otherwise dispose of all of the then outstanding malpractice claims that had been asserted on or before September 30, 1995.

---

[3] There were approximately 373 malpractice claims against various members of the PIT that were either unresolved or unpaid as of September 30, 1995.

[4] Provision 3.4 of the order appointing Gill read: "Receiver is authorized and empowered to enforce and collect any debts, claims, accounts receivable, rents or other obligations due the [PIT] and [PIC] and to institute and prosecute in his own name as such Receiver, suits for the enforcement and recovery of the same. Subject to the provisions in Paragraph 5 of this Order ('Notice') the Receiver is authorized and empowered to settle and compromise any such obligations whenever, in his judgment said compromise or settlement is in the best interests of the parties involved in this action."

Provision 3.5 of the order appointing Gill read: "Without limiting the generality of the foregoing Paragraph 3.4, the Receiver shall possess all rights of the Receivership Estate including [PIT] relative to claims against any one, including, without limitation, claims against members or former members of [PIT] for all assessments heretofore made by [PIT]. Receiver shall be entitled to make and enforce assessment in addition to those previously made to the extent permitted by applicable contracts and statutes."

One of those claims had been asserted by Young Mi Kim (Young) against Joong Tai Kim, M.D,. who, until March 25, 1994, had been one of the physician members of PIT. Dr. Kim became a member of PIT on March 9, 1987, with coverage retroactive to April 1, 1984. Dr. Kim's treatment of Young (a minor child six years of age) that led to the latter's malpractice claim began on or about December 27, 1985, and thus fell within the period for which coverage was provided by PIT. Apparently, Dr. Kim's treatment of Young extended into 1986, after which she saw other doctors in an attempt to resolve problems apparently created by Dr. Kim's negligence.

Sometime prior to January of 1993, Young filed an action in the Los Angeles Superior Court entitled *Young Mi Kim v. Joong Tai Kim, M.D.* (Super. Ct. L.A. County No. BS 030805). PIT undertook to defend Dr. Kim and provided him counsel. In January 1993, the matter was sent to arbitration pursuant to an agreement that had been signed on Young's behalf at the time of her first visit to Dr. Kim. Thereafter, discovery was taken and the matter ultimately went before the arbitrator on August 1, 1995. On September 19, 1995, after a hearing, at which neither Dr. Kim nor any counsel on his behalf were present, the arbitrator issued an award in the principal sum of $286,101.38, plus interest from the date the award was confirmed. The superior court entered an order confirming that award on November 22, 1995.

Dr. Kim was not present at the arbitration, and it was consequently handled as an uncontested matter, because sometime prior to June 29, 1994, he apparently had fled the country to avoid sentencing on a federal charge of filing a false tax return. He had pled guilty to that charge on October 12, 1993 and had been scheduled to be sentenced on June 29, 1994.[5]

As already indicated, Dr. Kim's membership in PIT ended on March 25, 1994. Beginning in early 1993, Dr. Kim had became delinquent in the payment of the quarterly fees due to PIT. In March of 1994, PIT sent a notice to Dr. Kim stating that due to his failure to pay the quarterly fees for the 3rd and 4th quarters of 1993, the 1st quarter of 1994 and the special assessment due on December 15, 1993, totaling $19,274, his membership could be terminated. By a letter dated March 28, 1994, PIC notified Dr. Kim that his

---

[5] The federal case is *United States v. Kim* (No. 93-815-LEW) and we granted the receiver's request that judicial notice be taken of that matter.

membership was terminated pursuant to section 24.04 of the PIT agreement,[6] effective March 25, 1994.[7]

On or about September 2, 1999, Young submitted to the receiver a medical malpractice claim seeking payment of her judgment against Dr. Kim. The total claim was then in the sum of $409,384.60, with interest calculated through September 30, 1999. On August 27, 2003, the receiver made a motion in the superior court for approval of Young's claim. In support of his motion, the receiver recited the general factual circumstances described above and then argued that PIT was liable to pay Young's judgment even though Dr. Kim had breached the PIT agreement by failing to pay quarterly fees and one assessment and, as a result, had been terminated as a member approximately 18 months prior to the entry of Young's judgment. The

---

[6] Section 24.04 of the PIT agreement provides, in pertinent part: "If a Member . . . fails to pay any Assessment or any fees when due, and if the Board of Trustees notifies the Member or withdrawn Member in writing of his or her delinquency, and if the delinquency is not cured by actual receipt by the Trust of the amounts due within 30 days from the date the Assessment or fees were due, the Member's membership in the Trust . . . as applicable, shall terminate on the later of the 30th day after the Assessment or fees were due, or 10 days after the notice of delinquency was sent to the Member by the Board of Trustees, which shall be the Member's Termination Date. *Upon such termination, the terminated Member . . . shall not be entitled to repayment of any part of his or her Initial Contribution nor shall he or she be entitled to Tail Coverage or any other indemnification under Section 1.* If the Trust is defending a "claim" under Section 2, it shall both continue to do so and continue to make supplemental payments under Section 3, but only for 10 days following the Termination Date; provided, however, that the Trust, in the sole discretion of the Board of Trustees, may continue to prosecute or defend against an appeal from a judgment rendered prior to the Member's Termination Date. The termination of a Member's membership, . . . shall not affect the right of the Trust to collect all amounts owing to the Trust by such Member or withdrawn Member." (Italics added.)

The portion of section 1 (§ 1.02) applicable to the retroactive coverage to which Dr. Kim had been entitled, provides that PIT "shall pay on behalf of the member, . . . *all amounts which meet each and all of the following conditions:*

"(a) *The Member must become legally obligated to pay* the amounts as 'damages' for 'injury' caused by any act, error or omission (i) of the Member . . . which act, error or omission happens while the Member . . . is rendering 'professional services.'

"(b) The act, error or omission causing the 'injury' must happen on or after the Retroactive Date and before the Commencement Date.

"(c) The 'claim' against the Member for 'damages' for the 'injury' must be 'first known' to the Member on or after the Commencement Date and on or before the Termination Date.

"(d) *The Member's liability to pay 'damages' and the amount of 'damages' to be paid must be finally determined either (i) by 'final judgment' against the Member entered by a court in the United States on or after the Commencement Date and on or before the Termination Date* or (ii) by execution and delivery of a written agreement among the Member, the claimant and the Trust on or after the Commencement Date and on or before the Termination Date." (Italics added.)

According to Dr. Kim's certificate of participation issued by PIT, his commencement date was March 9, 1987, and his retroactive date was April 1, 1984.

[7] It appears, however, that PIT's assigned counsel did not formally withdraw from providing Dr. Kim a defense in the Young action until March 6, 1995.

receiver rationalized this result by arguing that section 24.04 should be read as terminating only the member's right to indemnification, but not necessarily the PIT's obligation to victims of the member's malpractice; to reject a third party claim solely because of a member's breach and termination "is an absurd result inasmuch as the [PIT] was created to protect the innocent victims of medical malpractice from the mistakes and breaches by their doctors."[8]

Petitioner opposed the motion, on the grounds that the provisions of section 24.04 of the PIT agreement precluded such liability of PIT (see fn. 6, *ante*) and, in addition, the payment of Young's claim would directly offend section 1280.7, subdivision (a)(5) and (9)(D).[9]

---

[8] The record reflects that the receiver was successful with this argument in certain prior trial court proceedings. For example, the trial court to which this matter had previously been assigned (Hon. John Shook) expressed the following on March 6, 2002, in an order not directly relevant to the pending petition: "It seems to me that this issue of assessment and whether or not the Receiver has—and PIT has a legal obligation, it seems to me they do have a legal obligation. The Receiver can pay claims for terminated members. This is pursuant to the agreement itself that was executed [sic] on between the parties where the doctors agreed to unlimited—unconditional, unlimited personal liability. [¶] So I think that the former members can lawfully be assessed for money to pay items for which the receivership has a legal obligation. [¶] I think these claims are a legal obligation, and they are—all of the patient claims that are under consideration were by definition made prior to September the 30th of 1995 at a time when PIT and the covered members had represented to hospitals and other health care providers that malpractice coverage was in full force and effect. I think that the patient's rights to recover against [PIC] and PIT based upon legally required representation cannot, should not be defeated by any subsequent breach of the PIT agreement by [PIC] or PIT members such as the subsequent failure to pay the Receiver's first call or to maintain Norcal coverage which was a vehicle that was set up in the winding-up dissolution agreement that was worked out by the doctors that they would continue to have insurance, malpractice insurance under Norcal, so that they could continue to maintain their practice of medicine and continue to be affiliated with various hospitals that they were lined up with and serving."

The record does not reflect whether the factual circumstances which Judge Shook had before him were identical to those presented here. We include his order, however, because the trial court that issued the order before us appears to have heavily relied on Judge Shook's order (see fn. 10, *post*).

[9] Section 1280.7, subdivision (a)(5) provides, in pertinent part:

"(5) . . . Any person who obtains a *final judgment of recovery for medical malpractice* or other liability authorized by this section against a member of the interindemnity arrangement shall have, in addition to any other remedy, the right to assert directly all rights to indemnification which the judgment debtor has under the interindemnity arrangement. The final judgment shall be a lien on the reserve trust fund to secure payment of the judgment, limited to the extent of the judgment debtor's rights to indemnification."

Section 1280.7, subdivision (a)(9)(D) provides:

"(D)·In the event a participating member fails to pay any assessment when the same is due, the board of trustees may terminate that person's membership status if the failure to pay is not cured within 30 days from the date the assessment was due. Upon that termination the former participating member shall not be entitled to the return of all or any part of his or her initial contribution, *and the indemnity coverage shall thereupon terminate as to all claims then*

The trial court rejected petitioner's argument and, relying on the previous ruling by Judge Shook (see fn. 8, *ante*), granted the receiver's motion to approve the payment of Young's claim out of PIT's funds.[10] Petitioner then sought relief in this court by extraordinary writ. We issued an order to show cause, provided a briefing schedule and set the matter for oral argument.

## CONTENTIONS OF THE PARTIES

Petitioner's primary argument is that there is no legal basis for imposing liability on PIT for the judgment obtained by Young. Such a result, he argues, is directly contrary to the express provisions of section 1280.7, subdivision (a)(5) and (9)(D) (see fn. 9, *ante*) and similarly conflicts with the clear provisions of sections 1.02 and 24.04 of the PIT agreement (see fn. 6, *ante*). Petitioner likewise takes direct issue with the receiver's argument that the Legislature's intent in enacting section 1280.7 was to protect the interests of malpractice victims rather than provide a legal mechanism to assist physicians in obtaining economic malpractice coverage. Petitioner rejects the receiver's contention that a claimant could have rights, vis-a-vis the available assets of PIT, greater than those of the physician members.

The receiver, on the other hand, vigorously argues that both the relevant statutory provisions, as well as the PIT agreement, must be read so as to protect the interests of the claimants over those of the physician members of PIT. To do otherwise would provide a financial incentive for members to breach the PIT agreement so as to preclude a recovery against PIT and thus lessen their ultimate liability. The receiver also contends that it would be inequitable to deny Young's claim on the ground of Dr. Kim's termination prior to entry of the judgment in Young's favor. Finally, the receiver makes two technical procedural arguments relating to (1) petitioner's standing to oppose the receiver's motion or to challenge court approvals of claim settlements made by the receiver and (2) petitioner's failure to serve Young in this proceeding since it is the payment of her judgment that is at issue.

---

*pending against that person and in respect to all occurrences prior to the date of that termination of membership.* However, in the event the interindemnity arrangement is then providing legal defense services to that person, the interindemnity arrangement shall continue to provide those services for a period of 10 days following that termination." (Italics added.)

[10] The trial court announced its tentative ruling: "As a tentative it does appear that Judge Shook has determined that termination of members subsequent to claims accruing does not affect PIT's liabilities to claimants, although it would to members. So the tentative would be on the basis of Judge Shook's prior ruling, which I've interfered with a couple of his rulings, but I've tried to do it only in extreme cases, but I would stand on that and on that basis approve the plan."

After listening to argument from counsel, the trial court decided to stay with the tentative ruling. The court concluded the hearing by suggesting that petitioner had a "substantial argument" in his favor "but I do think probably the better view [*sic*] is that Judge Shook took."

## DISCUSSION

1. *The Power Of A Claimant To Recover From The PIT Was Limited By Both Relevant Statutory Provisions And The Agreement Establishing The PIT*

█ As we have already indicated, the Legislature enacted section 1280.7 in 1976 in response to a perceived medical malpractice crisis. (*Mundy v. Mutual Protection Trust* (1990) 219 Cal.App.3d 127, 130 [267 Cal.Rptr. 917] (*Mundy*).) It authorized interindemnity agreements among and between physicians and the creation of an interindemnity corporation and a trust to provide indemnity for the members of the corporation. It was designed to provide doctors with an alternative to costly medical malpractice insurance. This statute permitted physicians and surgeons to pool their resources to cover medical malpractice claims. The cooperative ventures formed pursuant to this legislation, however, were prohibited from representing that they were insurance companies. (§ 1280.7, subd. (f)(1), (2), (6).)[11]

█ Under the statute, the terms of a physician's membership in the trust is to be governed by a trust agreement. (§ 1280.7, subd. (a).) A prospective member receives a disclosure statement which contains, on the first or cover page, a legend in boldface type reading substantially as follows: "The interindemnity arrangement contemplated herein provides that participating members have unlimited personal liability for assessments which may be levied to pay for the professional negligence or other liability authorized by this section. No assurances can be given regarding the amount or frequency of assessments which may be so levied, or that all participating members will make timely payment of their assessments to cover the professional negligence or other liability authorized by this section." (§ 1280.7, subd. (c)(2).) Thus, each physician member agreed to accept unlimited personal liability for any and all assessments made by the board of trustees of PIT in order to pay outstanding qualified claims.

█ If a malpractice claimant obtained a judgment against a member, the claimant had the right to directly assert *that member's rights* to indemnification from the trust. (§ 1280.7, subd. (a)(5).) *Prior to a judgment or settlement*, a claimant did *not* have a direct right of action against the trust. (*Mundy,*

---

[11] Section 1280.7, subdivision (f)(1) and (2) states in relevant part: "It shall be a false or misleading statement to state or represent that a cooperative corporation or interindemnity arrangement is or constitutes 'insurance' or an 'insurance company' or an 'insurance policy.' "

Section 1280.7, subdivision (f)(6), states in relevant part: Making statements that "a cooperative corporation or interindemnity arrangement is a member of the California Insurance Guarantee Association, or insured against insolvency as defined in Section 119.5[]" is defined as an act of unfair method of competition and constitutes a deceptive act or practice.

*supra,* 219 Cal.App.3d at p. 132.) Upon entry of final judgment, however, the claimant would have a lien on the trust corpus, which lien would serve as security for payment of the judgment, but such lien would be *"limited to the extent of the judgment debtor's rights to indemnification."* (§ 1280.7, subd. (a)(5), italics added.)

■ In addition, the trust agreement was required to contain provisions whereby the membership of a physician who did not pay an assessment, or who otherwise failed to comply with the trust agreement, could be terminated by the board of trustees. (§ 1280.7, subd. (a)(9)(D) and (E).)[12] The statute provided that, upon such termination, *"the indemnity coverage shall thereupon terminate as to all claims then pending against that (the) person and in respect to all occurrences prior to the date of that termination of membership."* (§ 1280.7, subd. (a)(9)(D) and (E), italics added.)

This statutory limitation upon the power of a claimant to call upon assets of the PIT was reinforced and restated in sections 1.02 and 24.04 of the agreement (signed by all physician members) establishing the PIT (see fn. 6, *ante*).

2. *On This Record, The Receiver Had No Legal Basis For Seeking An Order To Disburse PIT Funds To Young*

There is no dispute in this record that Dr. Kim's membership in PIT, and thus his entitlement to indemnity, was terminated effective March 25, 1994, pursuant to the provisions of section 1280.7, subdivision (a)(9)(D) and (E) as well as section 24.04 of the PIT agreement. It is equally undisputed that Young's claim against Dr. Kim was not reduced to judgment until November 22, 1995, nearly 20 months later. Indeed, the arbitration hearing on which the judgment was based did not even commence until August 1, 1995, nearly one and a half years after Dr. Kim's right to indemnification under the PIT had been terminated.

The mandatory legal consequences of these undisputed facts was that Dr. Kim's right to indemnify coverage was "thereupon [terminated] as to *all claims then pending against* [Dr. Kim] and in respect to *all occurrences* prior to the date of the termination of membership." (§ 1280.7, subd. (a)(9)(D) and (E), italics added.)

The receiver does not dispute this conclusion but argues (and persuaded the trial court to conclude) that Young was nonetheless entitled to assert *her*

---

[12] This subdivision of section 1280.7 provided the authority for the contractual provisions set out in section 24.04 of PIT's trust agreement (see fn. 6, *ante*).

claim against the PIT. Put another way, the receiver takes the position that even though Dr. Kim may have lost *his* right of indemnification, Young was still entitled to the payment of her judgment. The receiver cites three reasons for his position: (1) PIT is equitably estopped to deny Young's claim; (2) denial of Young's claim would be contrary to the legislative purposes behind the enactment of section 1280.7; and (3) disapproval of Young's claim would harm the public by rendering interindemnity malpractice coverage agreements meaningless. None of these arguments has any merit.

### a. *There Is No Basis For Estopping PIT's Denial of Young's Claim*

At the time that Young first asserted her claim and filed the action in which her judgment was ultimately rendered, Dr. Kim *was* entitled to indemnification. An attorney was provided by PIT. Following the termination of Dr. Kim's coverage, however, that defense assistance was withdrawn.[13] The receiver argues that Young was never informed that PIT could withdraw Dr. Kim's defense and terminate its liability for coverage and, in reliance on such state of ignorance, agreed to arbitrate her claim, thus effectively delaying the time when a judgment could be entered. The receiver, however, provides absolutely no factual support for this speculative conclusion. We are not informed as to the date when Young allegedly "agreed" to arbitrate a dispute that she may have been contractually bound to arbitrate in any event. Similarly, we have not been advised as to whether or not the arbitration could have reasonably been held at any time prior to March 25, 1994 (the date of the termination of Dr. Kim's coverage); nor are we told as to whether a judicial resolution of the dispute could have occurred and resulted in the entry of a judgment prior to that date. Finally, we are provided with no factual basis for concluding that PIT intended that Young act on her (assumed) ignorance of the terms and conditions of Dr. Kim's coverage under the trust or that any acts or omissions of PIT in any way induced reliance on Young's part. Thus, at least two of the elements of estoppel[14] are only supported by the speculative argument of the receiver. This is obviously insufficient.

The receiver also argues that PIT should be estopped to deny Young's claim on the ground that it failed to disclose the terms and conditions of its

---

[13] Also, sometime during this period Dr. Kim was convicted of a federal tax felony and apparently fled the country prior to his sentencing date.

[14] In order to establish a claim or defense based on equitable estoppel, a party must establish four elements: "(1) The party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citation.]" (*Skulnick v. Roberts Express, Inc.* (1992) 2 Cal.App.4th 884, 890 [3 Cal.Rptr.2d 597].)

coverage liability to hospitals when it provided Certificates of Participation to its members, including Dr. Kim. This argument is more than a little puzzling. Assuming there was such a disclosure failure with respect to hospitals, it is not clear how such fact would impact the handling of Young's claim. In any event, the Certificate issued to the physician members clearly spelled out that coverage was restricted and subject to the terms and conditions of the trust agreement and that a named "participant may withdraw, or be expelled, from participation in [the] trust *at any time.*" (Italics added.)[15] This secondary argument by the receiver likewise is not sufficient to establish a basis for estoppel.[16]

> b. *Denial of Young's Claim Is Consistent With the Legislative Purpose and Intent Behind Section 1280.7 And Would Not Harm The Public*

The receiver argues that section 1280.7 was enacted to benefit the public and therefore to deny Young's claim would effectively undermine that purpose and harm the public. Petitioner, on the other hand, insists that the legislative purpose of section 1280.7 was "to provide members protection from medical malpractice claims." (*Stoops v. Abbassi* (2002) 100 Cal.App.4th 644, 647 [122 Cal.Rptr.2d 747].) We find ourselves in agreement with petitioner. That was our view when we filed our decision in *Stoops* and it is our view today.

---

[15] The Certificate of Participation issued by the PIT to Dr. Kim provided: "The Physicians Interindemnity Trust (PI Trust) is a medical malpractice interindemnity arrangement operating pursuant to California Insurance Code Section 1280.7 et seq. The above named participant, subject to the terms and conditions of the Trust Agreement, is entitled to indemnification of $1,000,000 per claim with an annual aggregate of $3,000,000 for claims arising on or after the above stated Commencement Date. Retroactive coverage, where a date for same is given above, is provided for the same limits under the terms and conditions of the Trust Agreement and the special conditions recited in the approved Retroactive Coverage application on file with PI Trust. [¶] Unlike insurance, PI Trust coverage does not require annual policy renewal. PI Trust coverage continues in force so long as the named participant complies with all of the terms and conditions of the Trust Agreement and maintains his membership status in the sponsoring organization, Physicians Interindemnity Cooperative Corporation. Subject to certain other conditions, a named participant may withdraw, or be expelled, from participation in PI Trust at any time. Where PI Trust has been requested in writing by the named participant to provide notice of change of participant status to others, notice will be dispatched by mail to the address and party requested."

[16] Interestingly, petitioner emphasizes that the equities actually flow to him and other physician members of the trust who have refused to settle with the receiver. Included in the record, is a copy of the judgment entered (on August 7, 2003), on these physicians' cross-complaint in one of the collection actions filed by the receiver (*Gill v. Abbassi*, Super. Ct. L.A. County No. BC174420). It is for the sum of $7,954,334.71. We note this only as a matter of interest; we do not in any way rely upon the fact of such judgment, which we understand is not yet final.

As we recognized in *Stoops*, and as the court in *Mundy* stated in its historical discussion of the statute, the Legislature considered this an emergency measure " '[d]ue to the continuing medical malpractice insurance crisis [and that it was] necessary that this act take effect immediately so that the interindemnity arrangements may commence functioning at the earliest possible time in order to avert the loss of services provided by health care providers.' [Citation.]" (*Mundy, supra,* 219 Cal.App.3d at p. 130.)

Such clear expression of legislative purpose in no way supports the receiver's argument. The Legislature was obviously concerned about public safety being harmed by a reduction in the number of physicians available to serve the public in light of ever escalating insurance premium costs. Who would be entitled to enforce claims and under what circumstances was spelled out in the statute and in the PIT agreement. The latter document, in section 1.02 (see fn. 6, *ante*), provided that before retroactive coverage could be available to a member such as Dr. Kim, the member would have to be "legally obligated to pay the amounts as 'damages' for an injury" and that such damages had to be finally determined by a *"final judgment"* against the member entered on or after the commencement date (in this case, March 9, 1987) and before the termination date (in this case, March 24, 1994).

We therefore reject the receiver's argument that a denial of Young's claim would somehow undermine the overall legislative purpose behind the enactment of section 1280.7. Just the opposite is true. The Legislature's purpose is clear. It was to allow physicians to band together and enter into agreements providing interindemnity coverage for those members against whom claims had been asserted. Strict conditions for coverage were imposed by both statute and contract. We cannot avoid the mandate of such unambiguous specific conditions by adopting some imaginary legislative goal that is belied by the statutory and contractual language, read as a whole, and the clear legislative history.

For the same reasons, we cannot conclude that a denial of Young's claim would in any way harm the public interest as argued by the receiver. We see no reason to believe that physician members would deliberately breach their obligations under the PIT agreement so as to avoid liability to claimants. The receiver's concern in this regard is overblown. A member who took such action would *lose* coverage; yet he or she would still have personal liability on the claim. Moreover, the PIT membership, as a group, has a right to rely upon the strict enforcement of the rules to which they all agreed and which limit and restrict the circumstances under which expenditures from the trust fund will be made.

### 3. There Is No Merit To The Receiver's Arguments Regarding Service Or Standing

The receiver claims that the petitioner, whose predecessor had filed this matter as a class action, does not have standing to proceed as a plaintiff because no class has been certified and he has not been certified as a class representative. We need not really address that argument since the petitioner Chen is a physician member of PIT and, as such, has a substantial *personal* interest in preventing improper disposition of PIT's assets. As we have already explained, the physician members, including Chen, have *unlimited* personal liability for all assessments that are made in order to satisfy the claims of qualified claimants. Every claim that is approved for payment out of the trust fund will have a direct and immediate adverse economic impact on Chen. Put another way, he is a party defendant in this action and, to the extent that claims are improperly paid, he would be directly and adversely affected. Assessments against petitioner would be increased.

Thus, there is no question, that petitioner is a party who can legitimately and individually claim a "beneficial interest" in the subject matter of the trial court order that we review. That a class has not been certified is of no significance. (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276] [a "beneficial interest" means "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large"].) Petitioner would, in any event, be entitled to oppose the receiver's motion as an individual.

The receiver also complains that the petitioner Chen has not been formally substituted in as the petitioner in intervention. It would, however, seem pointless to deny to petitioner consideration of his objection because of technical matters of form when any such application would clearly be granted and the trial court has apparently permitted the petitioner Chen to proceed without a formal substitution.[17] The interests of judicial economy and expeditious resolution of disputes dictate our rejection of this technical argument that would only serve to delay our decision in this matter for no useful purpose.

---

[17] Petitioner's brief in reply to the receiver's response to the petition states: "The initial Plaintiff In Intervention in the receivership proceedings was Lydia Chua Aguilara, M.D. After she settled the *Gill v. Abbassi* case with Gill, she was replaced by another Aguilar & Sebastinelli client. Dr. Reiner became the Plaintiff In Intervention when after Gill complained about it, the trial court authorized the substitution of a new Plaintiffs In Intervention *without formal action*. Upon Dr. Reiner's settlement of the *Gill v. Abbassi* case with Gill, Dr. Chen became the Plaintiff In Intervention in the same informal manner allowed by the trial court with respect to Dr. Reiner." (Italics added.) The record does not provide further support for petitioner's assertion, but the receiver has not disputed it.

Finally, the receiver's contention that the petition was required to be served on Young is without merit. The receiver cites us to no relevant authority *requiring* that Young be made a party to these writ proceedings. The receiver sought authority to pay Young's judgment from PIT assets. The trial court's ruling, and the decision of this court, will have no impact on that judgment or on any *vested* right of Young. It is true that Young might be a proper party to these proceedings as her interests might be indirectly affected by our decision (see *Manfredi & Levine v. Superior Court* (1998) 66 Cal.App.4th 1128, 1132 [78 Cal.Rptr.2d 494].) Thus, she could have sought to participate. She did not. Clearly she is not a *necessary* party since a decision may be reached in her absence. Put another way, while Young might be entitled to participate by an intervention application, it is not required that she be made a party.[18] Moreover, she did not seek to intervene in the trial court action. She will be no more adversely affected by our decision than any other unsatisfied claimant of any other physician member of PIT.

## DISPOSITION

The petition for writ of mandate is granted. Let a writ of mandate issue directing the trial court to vacate its order of September 10, 2003, granting the receiver's motion and to enter a new and different order denying the same. Petitioner shall recover his costs incurred in these writ proceedings.

Klein, P. J., and Aldrich, J., concurred.

On May 20, 2004, the opinion was modified to read as printed above.

---

[18] Furthermore, the receiver provides us with no reason to believe that Young could or might make any argument or assert any position that would overcome the statutory and contractual mandates that we find to be dispositive in this matter.