[No. B158336. Second Dist., Div. Three. Apr. 29, 2005.]

DAVID A. GILL et al., Plaintiffs and Respondents, v.
J. RONALD RICH et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.D and III.E.

**COUNSEL**

Aguilar & Sebastinelli, Raul V. Aguilar, Allen J. Kent and Dominic G. Flamiano for Defendant and Appellant J. Ronald Rich.

Wise Pearce Yocis & Smith and Michael J. Pearce for Defendant and Appellant Jehan Zeb Mir.

Danning, Gill, Diamond & Kollitz, George E. Schulman, Richard K. Diamond, John J. Bingham and John N. Tedford IV for Plaintiffs and Respondents.

Opinion

**ALDRICH, J.—**

## I.

## INTRODUCTION

Hundreds of physicians and surgeons formed an interindemnity arrangement pursuant to Insurance Code section 1280.7 to provide an alternative to medical malpractice insurance. In doing so, they funded a trust, Physicians Interindemnity Trust (PIT). Eventually, the trust was forced into receivership because it could not meet its obligations. Appellants are 47 members of PIT who refused to pay assessments levied on them by the receiver.

In the matter before us, the receiver obtained judgments against appellants for the unpaid assessments. Appellants appeal from these judgments and from a number of preliminary orders.

In the published parts of this opinion (pts. I., II., III.A, III.B, III.C, and IV.), we hold that appellants (1) could not rescind their contracts with PIT; (2) were responsible for the assessments; and (3) remained responsible for assessments even though their memberships had been terminated.

In an unpublished part of this opinion (pt. III.D), we reject appellants' contention that the trial court abused its discretion in permitting the receiver to amend the complaint. In another unpublished part of this opinion (pt. III.E), we conclude that the trial court improperly granted summary judgment against one appellant, Dr. Jehan Zeb Mir.

We affirm the judgments entered against 46 appellants. We reverse the judgment with regard to Dr. Mir.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The initial facts.*[1]

PIT and Physicians Interindemnity Cooperative Corporation (PICC) comprised an interindemnity arrangement pursuant to Insurance Code section

___

[1] We are acquainted with the facts surrounding the formation and destruction of PIT because other aspects of its demise have been, or are, before us. (E.g., *Suckle v. Aguilar* (Apr. 29, 2005, B171655) [nonpub. opn.]; *Chen v. Superior Court* (2004) 118 Cal.App.4th 761 [13 Cal.Rptr.3d 248]; *Abassi v. Welke* (2004) 118 Cal.App.4th 1353 [14 Cal.Rptr.3d 336]; *Stoops v. Abbassi*

1280.7. The primary purpose of the interindemnity arrangement was to provide indemnity and defense to physician/surgeon members for malpractice lawsuits. The interindemnity arrangement began operating in 1986 and grew to approximately 800 members. A board of trustees controlled PIT.[2]

Each member paid an initial capital contribution. Thereafter, members paid annual contributions and periodically each member was assessed when necessary to cover PIT's expenses. The funds were pooled and placed into the trust. The interest on the corpus, annual contributions, and assessments were expected to pay administrative and medical malpractice claim expenses.

Prior to becoming PIT members, all interested physicians and surgeons received documents discussing various aspects of the arrangement. These documents included a trust agreement (PIT Agreement), PIT's bylaws, and a disclosure statement.

On the front of the disclosure statement, information mandated by Insurance Code section 1280.7, subdivision (c)(2) and information included in subdivisions (f)(1) and (f)(2) of section 1280.7, were contained in the following statement, which appeared in bold face: "THE INTERINDEMNITY ARRANGEMENT CONTEMPLATED HEREIN PROVIDES THAT MEMBERS HAVE UNLIMITED PERSONAL LIABILITY FOR ASSESSMENTS WHICH MAY BE LEVIED TO PAY FOR THE PROFESSIONAL NEGLIGENCE LIABILITIES COVERED BY THIS ARRANGEMENT. NO ASSURANCES CAN BE GIVEN REGARDING THE AMOUNT OR FREQUENCY OF ASSESSMENTS WHICH MAY BE SO LEVIED, OR THAT ALL MEMBERS WILL MAKE TIMELY PAYMENT OF THEIR ASSESSMENTS TO COVER THE PROFESSIONAL NEGLIGENCE LIABILITY OF A MEMBER. PHYSICIANS INTERINDEMNITY TRUST IS NOT QUALIFIED AS AN INSURANCE COMPANY AND THE PROFESSIONAL NEGLIGENCE LIABILITY COVERAGE DESCRIBED HEREIN MAY NOT BE REPRESENTED TO BE INSURANCE OR TO CONSTITUTE AN INSURANCE POLICY."

Section 24.04 of the PIT Agreement stated that if a member failed to pay an assessment when due, his or her membership in the trust terminated and the terminated member was not entitled to repayment of any part of his or her

---

(2002) 100 Cal.App.4th 644 [122 Cal.Rptr.2d 747]; *Certain Defendants v. Lucas & Company* (July 26, 2002, B146230) [nonpub. opn.]; *Gill v. Abassi* (Oct. 19, 2000, B132954) [nonpub. opn.].)

[2] PIT and PICC overlapped in many respects, e.g., the PIT trustees were also the PICC trustees. Unless otherwise relevant, we need only discuss PIT.

initial contribution, tail coverage, or indemnification. However, the "termination of a Member's membership . . . shall not affect the right of the Trust to collect amounts owing to the Trust by such Member . . . ." (See fn. 22, *post.*)

B. *The events of September 1995.*

By September 11, 1995, the financial condition of PIT had deteriorated to the point that it could no longer continue to operate. At a meeting on that date, PIT's trustees voted for a plan to wind up PIT. The plan included a proposal from Norcal Mutual Insurance Company (Norcal) whereby Norcal agreed to provide *prospective* insurance coverage to members under certain conditions. Also, for a period of seven years, Norcal would rebate to PIT a percentage of the premiums received from members who chose to become insured through Norcal. According to the winding-up plan, PIT was to remain liable for all claims asserted by September 30, 1995. The winding-up plan revoked specified provisions of the PIT Agreement, such as the provision permitting members to voluntarily terminate membership. Other provisions of the PIT Agreement would remain in effect; for instance, the board of trustees would retain authority to assess members to meet the obligations of the trust in accordance with the PIT Agreement.

At the September 11, 1995, meeting, the PIT trustees also approved a $32.5 million assessment against the members. The assessment represented 2.2 times the amount of each member's annual fees. The winding-up plan gave authority to the board of trustees to collect the $32.5 million assessment "at the times and in the amounts as shall be determined by the Board in its sole discretion to be necessary and advisable . . . ."

Eventually, over 90 percent of PIT's members approved the winding-up plan. Appellants signed consent forms agreeing to become insured by Norcal and agreeing to the plan to wind up and terminate PIT.[3] All those who were PIT members as of September 30, 1995, including appellants, were bound by the winding-up plan.[4]

---

[3] After the demise of PIT, some members sued Norcal. (*Wu v. Safacorp.*, Super. Ct. L.A. County, No. BC178413, consolidated with *Reiss et al. v. Norcal.*) While the jury was deliberating, the parties reached a settlement. The amount to be paid in settlement was dependent upon the jury's verdict. After the jury reached a verdict, Norcal agreed to pay class members $27.5 million. In *Abassi v. Welke, supra,* 118 Cal.App.4th 1353, we were misled into believing that a $190 million verdict had been entered against Norcal in the consolidated case. (*Id.* at p. 1357, fn. 4.)

[4] Appellant Dr. Alejandro Aguilar did not agree to the winding-up plan. The parties agree, however, that he was bound thereto by virtue of specified provisions in the PIT Agreement.

C. *The events from 1996 through 1999, including the receiver's appointment.*

PIT's funds were depleted.

In March 1996, PIT and the Commissioner of Corporations stipulated to placing PIT into receivership.[5] On March 14, 1996, respondent David A. Gill was appointed receiver (the receiver). A receivership action was filed, *People v. Physicians Interindemnity Cooperative Corporation and Physicians Interindemnity Trust*, Super. Ct. L.A. County, No. BC145996. Therein, the receiver was given authority to enforce all assessment rights, enforce and collect all PIT debts, liquidate PIT, pay all claims against PIT, and institute appropriate litigation. Additionally, the receiver was given the authority to "make and enforce assessments in addition to those previously made to the extent permitted by the applicable contracts and statutes." Over the ensuing years, the receiver obtained instructions with regard to many issues, including authorizations to distribute funds, settle claims made by members' patients, and settle with members.

In a May 13, 1996, communication, the receiver notified PIT members that he was calling $28 million of the board of trustees' $32.5 million assessment (the First Call) and he was reserving the right to make future calls. In notifying the members of the call, the receiver sent a letter to all members stating: "I know that you are also aware that failure to pay the assessment constitutes grounds for releasing the Trust from any obligation to provide further defense or coverage for you, while not excusing you from your legal obligations relative to those assessments."

More than 80 percent of the members refused the First Call for funds.

Each appellant received a letter from the receiver in either May or July 1996 informing him or her of their membership status. In some letters, the receiver stated he believed the member's failures resulted in a membership termination.

D. *This collection litigation and steps taken in the receivership case.*

1. *The initial proceedings in this collection case.*

In July 1997, the receiver filed the collection case that is before us. The first cause of action sought to enforce the board of trustees' September 1995

---

[5] Corporations Code section 25100, subdivision (q)(1) vests in the Commissioner of Corporations the right to seek redress against any party violating Insurance Code section 1280.7. (*Mundy v. Mutual Protection Trust* (1990) 219 Cal.App.3d 127, 130–131 [267 Cal.Rptr. 917].)

assessment. The second cause of action alleged all PIT members were liable for all sums necessary to pay PIT's expenses, including malpractice claims, taxes, and administrative costs. The receiver sought $51 million, but reserved the right to amend the complaint to seek a different amount. The third, fourth, and fifth causes of action were for declaratory relief. The complaint alleged that the members were jointly and severally liable for all sums owing.

On April 6, 2000, the trial court granted appellants' motion for summary adjudication of the third, fourth, and fifth causes of action for declaratory relief. (See fn. 6, *post*.) Although ruling for appellants, the trial court also held in part, that appellants breached the PIT Agreement either by failing to pay the First Call, failing to remain insured with Norcal, failing to pay a past due assessment, or failing to pay on promissory notes owing to PIT. The trial court also held, as a matter of law and pursuant to the PIT Agreement, that each appellant was " 'terminated' as a member in PIT and in [PICC, was not entitled] to any repayment of any part of his or her Initial Contribution, [was not] entitled to any defense or indemnity from PICC/PIT or from the receivership estate, but that . . . said terminations shall not affect the right of PICC/PIT or of the Receiver to collect all amounts owing to PICC/PIT from such defendants." The receiver states that approximately 290 members were affected by this order.

On October 20, 2000, the trial court rendered a ruling that the liability of the members was several *but not* joint. (See fn. 6, *post*.) The trial court also ruled that the receiver could make a number of assessments.

## 2. *The 2001 assessment.*

On January 26, 2001, the receivership court authorized the receiver to apportion the assessments severally among those member/defendants who were still parties to this action. The receivership court permitted an assessment for all PIT liabilities. The amount to be assessed against each appellant was expressly approved by the receivership court.

On February 12, 2001, the receiver assessed the remaining members (including appellants) their pro rata share according to the receivership court's order. The purpose of this assessment was to pay the estimated costs of PIT's liabilities, as approved by the receivership court. No appellant has paid this assessment. This 2001 assessment forms the basis for the present appeal.

On July 18, 2001, the second cause of action was amended to allege appellants' failures to pay the February 12, 2001, assessment.

On October 16, 2001, the trial court struck appellants' 25th affirmative defense seeking to hold the receiver responsible for the alleged failures of

PIT's board of trustees, management company, managers, attorneys, and accountants, persons and entities, collectively labeled by appellants as "insiders." (Norcal was *not* included within the definition of an "insider.")[6]

With regard to the first and second causes of action, the receiver had brought a motion for summary adjudication on August 22, 2001. On December 14, 2001, the receiver's motion was granted with regard to the second cause of action. By this ruling, the trial court concluded that the receiver was entitled to recover the 2001 assessment from appellants (and other members who had not paid).

### 3. *The judgments.*

Upon dismissal of the first cause of action, the trial court entered 47 separate judgments between February 15, 2002, and October 29, 2002, against the 47 members who appear in this appeal as appellants. The judgments arose from the trial court's December 14, 2001, ruling.

### 4. *The 2003 assessment.*

On March 6, 2003, the receiver made a second assessment, after receiving permission from the receivership court to do so. The receiver filed another lawsuit to collect this assessment against a number of members, including appellants. (*Gill v. Aguilar,* Super. Ct. L.A. County, No. BC298288.) This case is presently pending in the superior court. We have been informed that no appellant has paid this assessment.

## III.

## DISCUSSION

## A. RESCISSION

*Appellants may not rescind their PIT contracts.*

Appellants contend the trial court erred in concluding they could not rescind the PIT Agreement. This contention is not persuasive.

---

[6] Appellants have not appealed from the April 6, 2000, October 20, 2000, or October 16, 2001, orders.

### 1. *Additional facts.*

At the earliest, rescission was raised in December 1998.[7] Subsequently, appellants pled rescission as a ground to defeat the receiver's lawsuit in three affirmative defenses (the 24th, 44th, and 48th affirmative defenses) contained in their restated amended answer. Appellants claimed they were entitled to rescind their contractual relationship with PIT because the PIT trustees and other insiders committed acts constituting fraud in the inducement, concealment, and misrepresentations, and committed acts in violation of Chapter 3 of the Insurance Code, sections 330–361.[8]

In other parts of the restated amended answer, appellants accused the insiders of failing to operate PIT in such a way as to keep it solvent. Appellants alleged the following: The insiders entered into contracts knowing the corpus did not have the required amount, breached fiduciary duties, misappropriated funds, failed to furnish appellants with required financial disclosures, failed to maintain the required bond, failed to permit the inspection of PIT's books and records, disseminated and filed with public officials false, misleading, and incomplete information regarding PIT's financial condition, entered into transactions and contracts without full disclosure or notification to appellants, squandered and depleted PIT funds, and misrepresented the facts relating to the Norcal transaction. For purposes of discussion, we assume these allegations were incorporated into the 24th, 44th, and 48th affirmative defenses.

The receiver moved to summarily adjudicate the 24th, 44th, and 45th affirmative defenses. The trial court granted the receiver's motion, treating it as a motion for judgment on the pleadings.

---

[7] The trial court found, and the receiver states, that rescission was first raised on December 8, 1998, when one member requested rescission in the *receivership* case. The receiver states that in this collection action, appellants did not raise rescission until June 1999, when they filed second amended answers. Appellants have not brought forth any facts addressing the date upon which rescission was first raised.

[8] The restated amended answer included the following:

The 24th affirmative defense for violation of statute stated: "[Appellants are] entitled to rescission of the contract sued upon because the INSIDERS acted to [appellants'] prejudice and violated the provisions of Chapter 3 of the California Insurance Code, beginning with § 330."

The 44th affirmative defense for rescission stated: "[Appellants are] entitled to rescission of the contract sued on herein based on equitable and legal grounds and based on fraud in the inducement by the INSIDERS in whose shoes [the receiver] now stands."

The 48th affirmative defense for rescission stated: "[Appellants are] is entitled to rescission of the contract sued on herein because of the concealment and misrepresentation of material facts by the INSIDERS in violation of Insurance Code §§ 330 through 361."

## 2. *Discussion.*[9]

### a. *Appellants may not accept the contracts' benefits and then rescind.*

By accepting the contracts' benefits, appellants have waived the right to rescind.[10]

PIT membership provided appellants with many benefits. They were able to represent to hospitals, clinics, and other entities that they were insured. From September 1995 (when there was a decision to wind up PIT) until December 1998 (the earliest date rescission was asserted) (see fn. 7, *ante*), appellants represented they had coverage for medical malpractice. They did this by sending certificates of participation to hospitals, clinics, and medical groups. (See Health & Saf. Code, § 1319 [permitting health facilities to require medical staff to have professional liability insurance].) Without such coverage, appellants would have been denied hospital privileges and medical group memberships. Further, during these three years, some appellants received defense and indemnity for medical malpractice claims.

Rescission is an equitable remedy. It is inappropriate to permit appellants to obtain the benefits of their membership for three years after PIT's collapse, yet avoid membership responsibilities through rescission. (*Neet v. Holmes* (1944) 25 Cal.2d 447, 457 [154 P.2d 854]; *Saret-Cook v. Gilbert, Kelly, Crowley & Jennett* (1999) 74 Cal.App.4th 1211, 1226 [88 Cal.Rptr.2d 732].) Parties may not " 'derive all possible benefit from the transaction and then claim the right to rescind.' " (*Saret-Cook v. Gilbert Kelly Crowley & Jennett, supra,* at p. 1226.)

Appellants have waived their right to rescind.

---

[9] Appellants appeal from the order granting a judgment on the pleadings. "A motion for judgment on the pleadings performs the same function as a general demurrer, and hence attacks only defects disclosed on the face of the pleadings or by matters that can be judicially noticed. [Citations.]" (*Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 999 [79 Cal.Rptr.2d 544].) We review the trial court's ruling on a judgment on the pleadings de novo as an issue of law. (*Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 603 [98 Cal.Rptr.2d 277]; *O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 606 [5 Cal.Rptr.2d 712].)

[10] Waiver is the intentional relinquishment of a known right after knowledge of the facts. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Padres Hacia una Vida Mejor v. Davis* (2002) 96 Cal.App.4th 1123, 1136 [117 Cal.Rptr.2d 727].) Ordinarily it is a question for the trier of fact. However, where there are no disputed facts and only one reasonable inference may be drawn, the issue can be determined as a matter of law. (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 [8 Cal.Rptr.3d 517, 82 P.3d 727].) In the case before us, the essential facts are not disputed. Further, appellants do not suggest that here waiver is a factual issue to be determined by a trier of fact.

b. *Appellants may not resist the collections efforts of a receiver through rescission.*

A party to a contract may rescind if "the consent of the party rescinding . . . was given by . . . fraud . . . ." (Civ. Code, § 1689, subd. (b)(1).) However, when " 'the rights of others have intervened and circumstances have so far changed that rescission may not be decreed without injury to those parties and their rights, rescission will be denied and the complaining party left to his other remedies.' (*Beckwith v. Sheldon* (1913) 165 Cal. 319, 324 [131 P. 1049].)" (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1099 [56 Cal.Rptr.2d 386], disapproved on another point in *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 280 [109 Cal.Rptr.2d 807, 27 P.3d 702].) Thus, "there can be no rescission where the rights of third parties would be prejudiced." (*Angle v. United States Fid. & Guar. Co.* (1962) 201 Cal.App.2d 758, 763 [20 Cal.Rptr. 391] [after insured property is destroyed, insurance company precluded from rescinding property insurance policy issued to property's owner as rescission would prejudice mortgage holder's rights]; accord, *Michell v. Grass Valley Gold Mines Co.* (1929) 206 Cal. 609, 617 [275 P. 418]; *Meyers v. Merillion* (1897) 118 Cal. 352, 356 [50 P. 662].)

Courts in other jurisdictions have applied this principle to conclude that members and subscribers of mutual insurance companies, mutual live stock companies, and interinsurance exchanges who believe they have been defrauded cannot avoid assessment liability imposed by a liquidating receiver. Rather, the members and subscribers may pursue those responsible for the fraud.[11]

In *Benham v. Manufacturers & Wholesalers Indem.* (Colo.Ct.App. 1984) 685 P.2d 249, a receiver appointed for an interinsurance exchange filed a collection lawsuit to recover assessments imposed by the receiver. One subscriber asserted it had been fraudulently induced to become a member by the exchange's false representations and by the Colorado Insurance Commissioner's concealment of the interinsurance exchange's insolvency. (*Id.* at pp. 253–254.) *Benham* concluded that any wrongdoing did not absolve the member of its assessment liability. (*Ibid.*) *Benham* reasoned, "a policyholder [can]not deny the existence of the insurance corporation so as to

---

[11] See *Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 702–705 [57 Cal.Rptr.2d 798] [tracing the historical background of reciprocal insurers, alternatively called interinsurance exchanges, and delineating their current nature]; *Tran v. Farmers Group, Inc.* (2002) 104 Cal.App.4th 1202, 1210–1211 [128 Cal.Rptr.2d 728] [discussing nature of reciprocal insurers]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶ 1:100, pp. 1-22 to 1-23 [same]; *State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 440–441 [8 Cal.Rptr.3d 56] [discussing nature of mutual insurance companies]; *Barnes v. State Farm Mut. Auto. Ins. Co.* (1993) 16 Cal.App.4th 365, 374–375 [20 Cal.Rptr.2d 87] [same].

avoid an obligation into which he had deliberately entered, and upon faith of which others became co-insurers and co-insured with him. To allow the policyholder to make the attack, and thereby avoid payment to the fund, would, in effect, permit him to practice fraud on the others." (*Id.* at p. 254.) The member could seek redress in a separate action against those responsible for the fraud. (*Ibid.*)

In *Dettra v. Kestner* (1892) 147 Pa. 566 [23 A. 889, 1892 Pa.LEXIS 893], officers of a mutual live stock company lied to a member at the time the member joined. Thereafter, a receivership took control of the company. (*Id.* at p. 578 [23 A. 889].) When the receiver demanded the member pay an assessment, the member asserted the defense of fraudulent inducement. The member alleged he was induced to apply for, and accept, membership in the company by the fraudulent representations of the officers of the company about the entity's financial standing. The member asserted he did not know of the fraud until the receiver sought collection of the assessment. (*Ibid.*) *Dettra* held that the member could not avoid an assessment because "the rights of innocent third parties have intervened, and it is essential to their protection that a contract, otherwise vitiated by fraud, and therefore voidable, should be sustained, equity requires that it be upheld." (*Id.* at p. 579 [23 A. at p. 890].) By its reference to innocent third parties, the court was apparently referring to other members of the company. (1892 Pa.LEXIS 893, ***1, 17.)

In *Smith v. Schwartz* (1960) 398 Pa. 555 [159 A.2d 220], the Pennsylvania Supreme Court quoted from, and followed *Dettra v. Kestner, supra,* 147 Pa. 566 [23 A. 889] to preclude policyholders of an insolvent mutual insurance company from asserting fraud in the inducement as a defense to an assessment levied by a liquidator. *Smith* reasoned that rights of innocent third parties, namely, other persons who had procured policies after those policyholders seeking to assert the fraud defense, had intervened. (*Smith v. Schwartz, supra,* at p. 559 [159 A.2d at p. 222].) Further, the policyholders had not attempted to nullify the policies "within a reasonable time after they became aware of the alleged fraud [by] the insurance company officials, but they waited more than two years after the commencement of the suit against them to allege the defense of fraud . . . ." (*Id.* at p. 560 [159 A.2d at p. 223].) In explaining why the other policyholders were innocent third parties who should be protected, the court painted this picture: "under mutual insurance policies, each policyholder is both an insured and insurer. He holds the umbrella of protection over the heads of his fellow-policyholders when they are pelted with losses, and has the right to have the umbrella raised over his head when losses rain down on him." (*Id.* at p. 556 [159 A.2d at p. 221].)

Wisconsin has adopted the same view. In *Duel v. Ramar Baking Co.* (1945) 246 Wis. 604 [18 N.W.2d 345], a person was fraudulently induced to become

a member of a mutual insurance company by "false representations as to the corporation's solvency. . . ." (*Id.* at p. 606 [18 N.W.2d at p. 346].) The member became aware of the fraud only after insolvency proceedings began. (*Ibid.*) The Wisconsin Supreme Court held that the member could not rescind and was not relieved of his liability under the policy because rights of third parties had intervened. "Rights of creditors and other policyholders intervened subsequent to the defendant's becoming a member. They are innocent of the fraud, and as to them the defendant has no right to cancellation or rescission of his policy, whatever its rights against the company were had it sought to exercise them." (*Id.* at pp. 606–607 [18 N.W.2d at p. 346].) Additionally, "voidance of membership [in a mutual insurance company] cannot be permitted after insolvency proceedings are begun, for every policyholder [member] would have equal right with the instant policyholder to void his contract, if not on the ground of fraudulent misrepresentations of solvency, on the ground of mistake of fact as to solvency and there might be no members left to respond to the claims of creditors." (*Id.* at p. 607 [18 N.W.2d at p. 347].)

■ An interindemnity arrangement is not an insurance company or an interinsurance exchange, but rather is designed to provide an alternative to insurance. (Ins. Code, § 1280.7, subd. (f)(1), (2), (6); *Chen v. Superior Court, supra,* 118 Cal.App.4th at p. 770; *Stoops v. Abbassi, supra,* 100 Cal.App.4th at p. 651.) However, for purposes of this discussion, an interindemnity arrangement has characteristics sufficiently similar to those of mutual insurance companies, mutual live stock companies, and interinsurance exchanges such that adopting the reasoning of these out-of-state cases is appropriate.

■ As in the cases discussed above, a receiver levied the assessments appellants challenge. When a receiver seeks collection, he or she is not acting as an ordinary plaintiff. Rather, the receiver acts as " 'a ministerial officer, agent, the creature, hand, or arm of, and a temporary occupant and caretaker of the property for, the court. He [or she] represents the court appointing him [or her], and he [or she] is the medium through which the court acts.' [Citations.]" (*Pacific Indem. Co. v. Workmen's Comp. App. Bd.* (1968) 258 Cal.App.2d 35, 40, fn. 5 [65 Cal.Rptr. 429].) "The receiver . . . [¶] [i]s neutral [and] [¶] [a]cts for the benefit of all who may have an interest in the receivership property; and [¶] [h]olds assets for the court and not for the plaintiff or defendant." (Cal. Rules of Court, rule 1903(a); see Code Civ. Proc., § 564 et seq.) In the case before us, the receiver is obligated to marshal all PIT assets, collect all outstanding obligations, and pay all debts in order to wind up PIT. (*Stoops v. Abbassi, supra,* 100 Cal.App.4th at p. 656.)

Further, like *Benham, Dettra, Smith,* and *Duel,* rescission harms the interests of a number of third parties. Rescission harms those PIT members who have relied upon all other members to fulfill their contractual obliga-

tions. The theory of the interindemnity arrangement is that through the combined resources of contributions, assessments, and interest, the PIT corpus will be sufficient to provide financial protection for all members for medical malpractice claims. (*Stoops v. Abbassi, supra,* 100 Cal.App.4th at pp. 654–655.) For example, in *Stoops v. Abbassi, supra,* 100 Cal.App.4th 644, Dr. Dale Stoops was a PIT member who paid the receiver's First Call. (*Ibid.*) When he was sued for malpractice, he requested coverage. (*Id.* at p. 648.) However, because an insufficient number of members responded to the assessment demand, the defense and indemnification being provided to Dr. Stoops ceased during the pendency of the lawsuit against him. Dr. Stoops was left to fend for himself. (*Ibid.*) Like Dr. Stoops, other PIT members facing malpractice lawsuits relied upon all of the PIT members, including appellants, to meet their pledge commitments.

Rescission by appellants harms other PIT members in additional ways. For example, because each PIT member is personally responsible for PIT's liabilities, if appellants rescind, the PIT members who have not sought rescission will be responsible for a greater share of PIT's liabilities. Alternatively, if appellants are permitted to rescind, then all PIT members will have the same right. If this occurs, there will be no source from which PIT can pay its obligations and respond to creditors. This will harm a wide variety of innocent third parties.

██ Additionally, if appellants were permitted to rescind, patients who had medical malpractice claims would be prejudiced. Patients who obtained a malpractice judgment or settlement have a statutory right to a lien on the trust corpus, limited to the physician's rights to indemnification. (Ins. Code, § 1280.7, subd. (a)(5); *Chen v. Superior Court, supra,* 118 Cal.App.4th at pp. 770–771.) If appellants and others rescind, those claimants who had timely asserted claims against PIT members and timely had obtained enforceable judgments or settlements (cf. *Chen v. Superior Court, supra,* 118 Cal.App.4th 761 [discussing when malpractice claimants are entitled to indemnification from PIT]) would be unable to obtain indemnity from PIT. For example, third party claimants, like the one who obtained an enforceable judgment against Dr. Stoops, would be denied protection. Their claimant's lien would be meaningless and it would be less likely they would recover for their injuries. Also, hospitals, medical groups and clinics, all of which relied upon the representation that appellants had medical malpractice coverage, could be harmed.[12]

---

[12] Citing *Mundy v. Mutual Protection Trust, supra,* 219 Cal.App.3d 127, appellants assert the victims of malpractice are not innocent third parties as they have no rights against the trust. Appellants' citation to *Mundy* does not advance their argument. *Mundy* followed *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], to hold that a third party malpractice claimant cannot bring a third party claim against an interindemnity arrangement and its related trust for bad faith practices.

Finally, appellants' claim for rescission is unjust. Appellants did not allege there was fraud at the inception of appellants' relationship with PIT. Appellants did not allege that they were not told of their potential unlimited personal liability. Appellants did not allege that the liquidating receiver,[13] or the nonrescinding PIT members, such as Dr. Stoops, committed fraud. Rather, the only factual claims of fraud contained in the restated amended answer were that the insiders committed fraud in the management of the trust. Appellants phrase it this way on appeal: they were the "victims of a massive fraud by the members of the Board of Directors, PIT's management company and others in the inducement . . . to remain a member of the organization." Appellants highlight their allegation that PIT's trustees, in breach of their fiduciary duties, concealed PIT's financial condition.[14] But, appellants were in the best place to present these purported wrongs. PIT members, including appellants, were in the position to monitor PIT's financial condition, PIT's board, management company, managers, lawyers and accountants. The third party personal injury claimants, the hospitals, the medical groups, and the clinics were not in the same position. Thus, there is a basic unfairness to appellants' plea for rescission.[15]

■   Therefore, appellants, as members of an interindemnity arrangement, may not seek to defeat assessments imposed by a liquidating receiver through rescission.

Our holding that appellants may not rescind the PIT contract does not leave appellants without recourse. Rather, they are free to pursue those who purportedly committed the fraud. And, appellants have done so. Appellants sued the trustees and obtained a settlement from Norcal. (See fns. 3 & 14, *ante*.)

Appellants are foreclosed from rescinding their contracts with PIT.

---

[13] The receiver cannot be held for the acts of the insiders. On October 16, 2001, the trial court struck appellants' 25th affirmative defense seeking to hold the receiver responsible for the alleged failures of the insiders. Appellants have not appealed from this order and thus, cannot propose that any acts by the receiver warrant rescission. (See fn. 6, *ante*.)

[14] In *Suckle v. Aguilar, supra*, B171655, appellants obtained a jury verdict against the board of trustees. (See fn. 1, *ante*.) Thereafter, upon a stipulation as to the amount of damages, a verdict was entered against the trustees in the sum of $7,954,334.71. Oral argument of *Suckle v. Aguilar* was heard in February, 2005. On the same date this opinion is filed, we rendered an opinion in *Suckle* in which we reversed the judgment and ordered judgment be entered in favor of the trustees. We concluded that the record lacked substantial evidence to support the jury's finding that the acts of the trustees *caused* appellants any harm.

[15] Appellants further contend that they were denied due process because the trial court's ruling striking the 24th, 44th, and 48th affirmative defenses denied them an opportunity to present evidence that third parties would not be prejudiced. The harm to Dr. Stoops and the medical malpractice claimant in that case refutes this argument.

## B. "ADVANCE OF LOSS"

Appellants contend the trial court erred in summarily adjudicating the second cause of action against them. We find this contention unpersuasive.[16]

### 1. *Appellants' argument.*

Appellants acknowledge they are responsible for assessments that have been lawfully imposed, including those that have been imposed by the receiver. Appellants argue, however, that assessments that are designed to pay third party claimants cannot be levied until the claim has been resolved by an enforceable judgment or settlement, i.e., has been fixed or liquidated.[17]

Appellants' argument is presented in the following four steps:

(1) Interindemnity arrangements are not insurance companies. They may not represent themselves to be insurance companies (Ins. Code, § 1280.7, subd. (f)(1), (2)), and, by their nature may not collect in "advance of loss." Insurance companies establish reserves and may collect premiums in advance of loss, but interindemnity arrangements may not do so because these entities are conceptually different.

(2) The difference between insurance companies and interindemnity arrangements is demonstrated in the preamble to Insurance Code section 1280.7, which provides in part: "This chapter and the other provisions of this code, except as set forth in this paragraph, *shall not apply to* or affect unincorporated interindemnity or reciprocal or interinsurance contracts between members of a cooperative corporation, organized and operating under Part 2 (commencing with Section 12200) of Division 3 of Title 1 of the Corporations Code whose members consist solely of physicians and surgeons licensed in California, which contracts indemnify solely in respect to medical malpractice claims against those members, and *which do not collect in advance of loss any moneys other than contributions by each member to a collective reserve trust fund or for necessary expenses of administration.*" (Italics added.)

---

[16] Appellants brought a motion for summary adjudication based upon their contention that they did not have a duty to pay an assessment insofar as it attempted to collect money in "advance of loss." In a January 26, 2001, order, the trial court denied the motion. Thereafter, in opposing the receiver's August 22, 2001, motion for summary adjudication, appellants repeated the same argument.

Appellants appeal from the judgments entered against them and the underlying order denying their summary adjudication motion. The parties agree that because there are no disputed facts, we examine the issue as a matter or law.

[17] Appellants' position with regard to the payment of PIT's cost of administration is unclear.

The difference between an insurance company and an interindemnity arrangement is also shown in section 21.01 of the PIT Agreement, which incorporates Insurance Code section 1280.7, subdivision (a)(5). These limit the sources from which interindemnity arrangements may seek to pay claims. Subdivision (a)(5) states in part, "The income earned on the corpus of the trust fund shall be the source of payment of the claims, costs, judgments, settlements, and costs of administration contemplated by the interindemnity arrangement . . . ."

(3) PIT Agreement section 1.01(c) limits PIT's indemnification responsibilities. Section 1.01(c) states, "The Member's liability to pay 'damages' and the amount of 'damages' to be paid must be finally determined either (i) by 'final judgment' against the Member entered by a court in the United States . . . or (ii) by execution and delivery of a written [settlement] agreement among the Member, the claimant and the Trust. . . ." (See also PIT Agreement, § 1.02.)[18]

(4) The receiver cannot assess until there has been a final determination of a claim, or a liquidated sum because PIT is defined as one that may *not* collect in "advance of loss," PIT Agreement section 21.01 and Insurance Code section 1280.7, subdivision (a)(5) only allow assessments to meet the

---

[18] PIT Agreement section 1.01 provides: "The Trust shall pay on behalf of each Member . . . all amounts which meet each and all of the following conditions: [¶] (a) The Member must become legally obligated to pay the amounts as 'damages' for injury' caused by any act, error or omission (i) of the Member, or (ii) of any person for whose acts, errors or omissions the Member is legally liable, in each case which act, error or omission happens while the Member or such other person is rendering 'professional services.' [¶] (b) The act, error or omission causing the 'injury' must happen on or after the Commencement Date and on or before the Termination Date. [¶] (c) *The Member's liability to pay 'damages' and the amount of 'damages' to be paid must both be finally determined either (i) by 'final judgment' against the Member entered by a court in the United States on or after the Commencement Date and on or before the Termination Date or (ii) by execution and delivery of a written agreement among the Member, the claimant and the Trust on or after the Commencement Date and on or before the Termination Date.*"

PIT Agreement section 1.02 relating to retroactive coverage contains similar language. It states in part: "The Trust shall pay on behalf of the Member, . . . all amounts which meet each and all of the following conditions: [¶] (a) The Member must become legally obligated to pay the amounts as 'damages' for 'injury' caused by any act, error or omission . . . of the Member . . . which act, error or omission happens while the Member . . . is rendering 'professional services.' [¶] (b) The act, error or omission causing the 'injury' must happen on or after the Retroactive Date and before the Commencement Date. [¶] (c) The 'claim' against the Member for 'damages' for the 'injury' must be 'first known' to the Member on or after the Commencement Date and on or before the Termination Date. [¶] (d) The Member's liability to pay 'damages' and the amount of 'damages' to be paid must be finally determined either (i) by 'final judgment' against the Member entered by a court in the United States on or after the Commencement Date and on or before the Termination Date or (ii) by execution and delivery of a written agreement among the Member, the claimant and the Trust on or after the Commencement Date and on or before the Termination Date."

obligations of the trust, and PIT Agreement section 1.01(c) limits PIT's obligations to pay third party claimants to situations where the claim has been "finally determined" by a final judgment or settlement agreement.

### 2. *Appellants may be assessed in "advance of loss."*

#### a. *Neither Insurance Code section 1280.7 nor the PIT Agreement prohibits an assessment in "advance of loss."*

■ The preamble of Insurance Code section 1280.7 quoted above uses the phrase "collect in advance of loss" to distinguish an interindemnity arrangement from a traditional insurance company that assesses insureds to pay premiums based upon future, expected losses. A "loss" in this context means an event that gives rise to coverage under the insurance coverage. However, when PIT, an interindemnity arrangement, imposes an assessment it does not seek to collect in "advance of loss" when it seeks funds to pay *claims* and expenses. Rather, it seeks payments for malpractice events that have already occurred.

■ The PIT Agreement defines a "claim" as "a demand for money asserted against a Member," which may include "the institution of a 'suit.' " This occurs after a loss has occurred. Thus, an assessment levied prior to a claim becoming "liquidated," is not an assessment "in advance of loss."[19] Further, the preamble of Insurance Code section 1280.7 does not prohibit an assessment based upon an estimate of the amount needed to pay claims that have already been tendered to a PIT member or to PIT. Such assessment is not based upon projections of future, expected losses, such as the premiums collected by an insurance company.

Here, the receiver's collection efforts were designed to pay PIT's contractual obligation to defend, and if necessary indemnify. The receiver's assessment was designed to pay for malpractice events that had occurred prior to October 1, 1995. Thus, the assessment efforts were not asking for money based upon expected future claims; the claims had been made for malpractice events that had already happened.

---

[19] In the definitional section of the PIT Agreement, a "claim" was defined as "a demand for money asserted against a Member. The institution of a 'suit' may be a 'claim.' " The same section stated in part: "A 'claim' is 'first known' to a Member (i) at such time as the Member, his agent, employee or representative first has knowledge or becomes aware of any act, error or omission or any 'injury' which the Member, his agent, employee or representative knows or should reasonably foresee could give rise to the assertion of a 'claim' or the institution of a 'suit' against the Member or (ii) in absence of such knowledge or foresight, at such time as the Member, his agent, employee or representative first has knowledge that a 'claim' is asserted against such Member."

Subdivision (a)(5) of Insurance Code section 1280.7 and PIT Agreement section 21.01 also support this conclusion. Subdivision (a)(5) states in part: "The income earned on the corpus of the trust fund shall be the source for the payment of the *claims, costs, judgments, settlements, and costs of administration* contemplated by the interindemnity arrangement, and to the extent the income is insufficient for those purposes, the board of trustees shall have the power and authority to assess participating members *for all amounts necessary to meet the obligations of the interindemnity arrangement* in accordance with the terms thereof." (Ins. Code, § 1280.7, subd. (a)(5), italics added.) PIT Agreement section 21.01 essentially repeats the language of Insurance Code section 1280.7, subdivision (a)(5). Section 21.01 states that the PIT corpus "shall be the source for the payment of the claims, costs, judgments, settlements, and costs of administration . . . , and to the extent such income is . . . insufficient for such purposes, the Board of Trustees shall have the power and authority to assess Members for all amounts necessary to meet the [trust's] obligations . . . ."

Insurance Code section 1280.7, subdivision (a)(5) and PIT Agreement section 21.07 contemplate the imposition of assessments when necessary to cover "claims" and "costs." They give the PIT board of trustees the authority to assess participating members for *all amounts necessary to meet PIT's obligations.* "Claims," demands of money, and costs of administration are contemplated to be obligations of the entity. Thus, these provisions do *not* limit assessments to those situations in which a malpractice claim has been reduced to judgment or to an agreed upon amount by settlement.

Further, the winding-up plan foresees that PIT will be liable for all claims asserted by September 30, 1995. By definition, a "claim" would not be liquidated at the time the winding-up plan was entered into. In that all PIT members had unlimited liability for PIT's debts, the members would be liable for any claim that has been asserted by that date.

Nonetheless, appellants point to section 1.01 of the PIT Agreement and our recent opinion of *Chen v. Superior Court, supra,* 118 Cal.App.4th 761, to suggest the assessments were improper. These do not assist appellants.

PIT Agreement section 1.01 delineated PIT's indemnification responsibilities. It stated that the trust was to indemnify a member where a medical malpractice lawsuit against the member had been resolved by a final judgment or settlement and when such occurrences occurred "before the member's membership was terminated . . . ." (See fn. 18, *ante.*) In *Chen v. Superior Court, supra,* 118 Cal.App.4th 761, a third party claimant obtained a judgment against a former member of PIT *after* that member's membership had been terminated in March 1994. (*Id.* at pp. 765–766.) We held that the time-sensitive good-standing requirement in PIT Agreement section 1.01 and

subdivision (a)(9)(D) and (E) of Insurance Code section 1280.7—stating that member's indemnification coverage terminated as to all claims pending at the time of termination—precluded the third party claimant from obtaining indemnification from the trust. (118 Cal.App.4th at pp. 771–775.) Thus, *Chen v. Superior Court* and section 1.01 of the PIT Agreement discussed PIT's obligations to third party claimants pursuant to PIT's indemnification promises. They did not address the issues before us.

### b. *Appellants' argument ignores reality.*

In contending assessments cannot be levied upon them until the underlying obligation is "liquidated," appellants ignore the factual underpinnings of this case and the practicalities of running and administering an interindemnity arrangement.

The short story is that a number of physicians and surgeons grouped together expecting that their pooled funds placed in PIT would be sufficient to pay the malpractice claims made against all members. Members knew that they had unlimited personal liability; members knew they could be liable for assessments. When the fund was insufficient to cover all claims and attendant costs, PIT was forced into receivership, and a liquidating receiver was brought in to oversee PIT's closure.

A system that would require all medical malpractice claims brought against the members be reduced to judgment or settlement before the receiver could resolve them would hamper the receiver's ability to settle claims and administer the fund. It would require the receiver to levy assessments repeatedly, and frequently.

*Mitchell v. Pacific Greyhound Lines* (1939) 33 Cal.App.2d 53 [91 P.2d 176], involved the liquidation of a reciprocal or interinsurance exchange and a statutory scheme that did not expressly provide for subscriber assessments. (*Id.* at p. 64.) To facilitate liquidation, *Mitchell* interpreted the then-existing statutory scheme and the liquidation act in effect at that time to permit assessments upon liquidation. (*Id.* at p. 65.) In *Mitchell,* calculating the exact amount of each subscriber's assessment would have been a logistical nightmare, requiring the "expenditure of a large amount of time and money." (*Id.* at p. 67.) *Mitchell* approved the liquidator's method of calculating the individual assessments as it was fair, applied equally, and substantially correct. (*Id.* at pp. 67–68.)

Like the liquidator in *Mitchell,* the receiver had the responsibility to marshal all PIT assets and pay all PIT debts. (*Stoops v. Abbassi, supra,* 100 Cal.App.4th at p. 656.) He was not attempting to run this interindemnity

arrangement as an ongoing entity. The receiver's approach to assessments logically corresponded to his responsibilities, as well as to the interindemnity arrangement scheme and the winding-up plan. Appellants, as members of the interindemnity arrangement, knew they had unlimited personal liability for PIT's debts and they knew they were subject to unlimited assessments to meet PIT's obligations. When they obligated themselves to wind up PIT, they obligated themselves to pay all of PIT's liabilities.

Appellants' only reasonable objection is that there is a possibility that the receiver's assessment power will lead to the collection of excess funds. However, the repayment to members of any excess would easily resolve this problem. (Cf. *Barger v. All-Coverage Ins. Exchange* (1971) 20 Cal.App.3d 675, 680–681 [97 Cal.Rptr. 888].)

The assessments were properly imposed and were not improper collections in "advance of loss."

## C. ASSESSEMENTS AFTER TERMINATION

Appellants concede that once the plan to wind up PIT was in effect, members could no longer voluntarily terminate their membership. Appellants argue, however, that their memberships were terminated *in*voluntarily, and upon such occurrence, they were not responsible for assessments levied after the termination date.[20] This argument is unpersuasive.[21]

Acknowledging that neither the PIT Agreement nor Insurance Code section 1280.7 directly address whether a member who has been involuntarily terminated is responsible for future assessments, appellants point to provisions discussing "members" or "participating members" in the PIT Agreement and Insurance Code section 1280.7. Appellants state that these terms are used when assessments are discussed. (E.g., Ins. Code, § 1280.7, subd. (a)(5), (9)(D); PIT Agreement, § 21.01.) Appellants note that when the term "former participating member" is used, it refers to those whose membership has been terminated. (See fn. 22, *post.*) Focusing on the different use of these terms, appellants argue "terminated former members are not liable for continual assessments indefinitely [after] their PIT membership terminated."

---

[20] Appellants assert the receiver terminated their memberships in July 1996. They base this assertion on an allegation in the receiver's complaint and on letters sent by the receiver to different groups of members. The receiver states that the members were terminated on April 6, 2000, by the trial court's order. This factual dispute need not be resolved. We note, however, that even if the members were terminated in July 1996, this was *after* the last date for which PIT was responsible for malpractice claims, i.e., after September 30, 1995.

[21] In raising this argument, appellants appear to appeal from the overruling of their demurrer to the second amended complaint and from the subsequently entered judgment entered against them. Appellants seem to agree that we review the issue de novo.

■  However, appellants' memberships were terminated after PIT was placed into receivership for their failure to pay lawfully imposed assessments. By then, all claims for which PIT was responsible, and hence for which appellants were responsible, had been made. The receiver's assessment was to meet PIT's obligations as of September 1995, prior to any appellant being terminated. (See fn. 20, *ante.*) The members of PIT who are bound to the winding-up plan cannot walk away and escape liability. A breaching party may not escape contractual liability when the contract is canceled due to his or her own breach. (7 Corbin on Contracts (2002) § 28.26, p. 107 ["If a contract is canceled for the other party's breach, damages are still owed."].)

Further, the PIT Agreement binds appellants. Section 24.04 of the PIT Agreement states in part that if a member fails to pay an assessment or fees when due, was notified of that delinquency, and did not timely cure the delinquency, "the Member's membership in the Trust . . . shall terminate. . . . Upon such termination, the terminated Member . . . shall not be entitled to repayment of any part of his or her Initial Contribution nor shall he or she be entitled to Tail Coverage or any other indemnification . . . . The termination of a Member's membership . . . *shall not affect the right of the Trust to collect amounts owing to the Trust by such Member or withdrawn Member.*" (Italics added.)[22] Also, section 21.01 of the PIT Agreement states that members can be assessed "for all amounts necessary to meet the obligations of the Trust . . . ."

Thus, appellants were contractually obligated to pay for the assessments levied upon them after their memberships were terminated.

D., E.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

---

[22] Section 24.04 of the PIT Agreement provided that if a member failed to pay an assessment or any fees when due, was notified of that delinquency, and did not cure timely the delinquency, "the Member's membership in the Trust . . . shall terminate . . . . Upon such termination, the terminated Member . . . shall not be entitled to repayment of any part of his or her Initial Contribution nor shall he or she be entitled to Tail Coverage or any other indemnification . . . . If the Trust is defending a 'claim' [made against the member, such defense would continue only] for 10 days following the Termination Date . . . . The termination of a Member's membership . . . shall not affect the right of the Trust to collect all amounts owing to the Trust by such Member or withdrawn Member."

*See footnote, *ante,* page 1254.

## IV.

## DISPOSITION

The judgment as to Dr. Mir is reversed. Dr. Mir is entitled to his costs on appeal. The judgments as to all other appellants are affirmed. With regard to these other appellants, the receiver is entitled to costs on appeal.

Klein, P. J., and Croskey, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 27, 2005.